**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TONYA BROWN, JOHN ELSTAD, ALBERT GOEKEN, ELIZABETH HOMAN, and JEFFERY SAMPERE, | Civil Action No. 15-cv-9022(GBD) |
| Plaintiffs, | ECF Case |
| -v- | |
| CERBERUS CAPITAL MANAGEMENT, L.P., CERBERUS COVIS LLC, COVIS HOLDINGS, L.P., COVIS MANAGEMENT INVESTORS LLC, COVIS US HOLDINGS, LLC, COVIS MANAGEMENT INVESTORS US LLC, COVIS PHARMACEUTICALS, INC., ALEXANDER BENJAMIN, MICHAEL KELLY, and ETHAN KLEMPERER, | |
| Defendants. | |

---

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(6) AND 9(b)

---

**LOWENSTEIN SANDLER LLP**
1251 Avenue of the Americas
New York, NY 10020
(212) 262-6700
*Attorneys for Defendants*

On the brief:
    Gavin J. Rooney, Esq.

# <u>TABLE OF CONTENTS</u>

Page(s)

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF THE CASE ............................................................................................ 3

    I.    The Initial Corporate Structure ............................................................................ 3

    II.   The 2013 Restructuring ......................................................................................... 5

    III.  The End of Plaintiffs' Employment and Redemption of Their Profits
          Interests ................................................................................................................. 6

    IV.  The Complaint's Claims of Wrongdoing .............................................................. 8

MOTION TO DISMISS STANDARD ................................................................................ 8

ARGUMENT ....................................................................................................................... 9

    I.    ALL OF THE COMPLAINT'S FRAUD COUNTS SHOULD BE
         DISMISSED ......................................................................................................... 9

         A.    The Complaint Fails to Plead Specific Facts Evidencing a Strong
              Inference of Fraudulent Intent Not to Perform Under the Award
              Agreements ............................................................................................... 9

         B.    The Fraud Claims Against Cerberus Capital Management, L.P. and
              Cerberus Covis LLC Also Fail as Neither is Even Alleged to Have
              Made a False Statement and No Facts Are Alleged to Establish
              Control Person Liability .......................................................................... 14

         C.    The Aiding-and-Abetting Claims Against Defendants Alexander
              Benjamin and Michael Kelly Also Fail Because They Rest on
              Mere Conclusions Insufficient under *Twombly* and *Iqbal* ..................... 17

    II.   THE BREACH-OF-CONTRACT COUNTS SHOULD BE DISMISSED ........... 17

         A.    Plaintiffs' Claims For Breach of the MIP I Award Agreements
              (Count Twelve) Should Be Dismissed, Since Those Interests Were
              Redeemed and Released .......................................................................... 17

         B.    Plaintiffs' Claim for the Value of Their Unvested Profits Interests
              Should Be Dismissed, Because Those Interests Were Contractually
              Terminated .............................................................................................. 18

         C.    Plaintiffs' Claims for Fair Market Value of Their MIP II Profits
              Interests Should Be Dismissed, Since the Complaint Does Not
              Plead Facts Showing Bad Faith by the MIP II Board .............................. 20

III.    THE QUASI-CONTRACT CLAIMS SHOULD BE DISMISSED
        BECAUSE PLAINTIFFS' RIGHTS ARE CONTROLLED BY
        CONTRACT ................................................................................................23

CONCLUSION ................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*AM Gen. Holdings, LLC v. Renco Group, Inc.*,
  No. 7639, 2013 Del. Ch. LEXIS 266 (Del. Ch. Oct. 31, 2013) ...........................................24

*Arco Capital Corp. v. Deutsche Bank AG*,
  986 F. Supp. 2d 296 (S.D.N.Y. 2013)...................................................................................14

*Asarco LLC v. Goodwin*,
  756 F.3d 191 (2d Cir. 2014)...................................................................................................3

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).......................................................................................8, 9, 17, 20

*Atkinson v. Lackey*,
  12-CVS-7600, 2015 N.C.B.C. LEXIS 21 (N.C. Super. Ct. Feb. 27, 2015) ..........................16

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).........................................................................................9, 16, 17, 20

*Bernard v. Netegrity, Inc.*,
  No. 00 Civ. 3001(LMM), 2000 U.S. Dist. LEXIS 17299 (S.D.N.Y. Nov. 30,
  2000) .............................................................................................................................19, 25

*Bradshaw v. Maiden*,
  14-CVS-14445, 2015 N.C.B.C. LEXIS 80 (N.C. Super. Ct. Aug. 10, 2015).........................17

*Brinsights LLC v. Charming Shoppes of Del., Inc.*,
  06 Civ. 1745, 2008 U.S. Dist. LEXIS 3787 (S.D.N.Y. Jan. 16, 2008)...................................24

*Capital Mgmt. Select Fund v. Bennett*,
  680 F.3d 214 (2d Cir. 2012)...............................................................................10, 11, 12

*Central Bank, N.A. v. First Interstate Bank, N.A.*,
  511 U.S. 164 (1994)................................................................................................................14

*Clean Harbors, Inc. v. Safety-Kleen, Inc.*,
  No. 6117, 2011 Del. Ch. LEXIS 184 (Del. Ch. Dec. 9, 2011) .............................................22

*CMS Inv. Holdings, LLC v. Castle*,
  No. 9468, 2015 Del. Ch. LEXIS 169 (Del. Ch. June 23, 2015) ...........................................20

*Cortec Indus., Inc. v. Sum Holding L.P.*,
  949 F.2d 42 (2d Cir. 1991).......................................................................................3, 18, 19

*DealTime.com Ltd. v. McNulty*,
    123 F. Supp. 2d 750 (S.D.N.Y. 2000)................................................................14

*Defer LP v. Raymond James Fin., Inc.*,
    2010 U.S. Dist. LEXIS 91856 (S.D.N.Y. Sep. 2, 2010)......................................15

*Dujardin v. Liberty Media Corp.*,
    359 F. Supp. 2d 337 (S.D.N.Y. 2005)................................................................14

*DV Realty Advisors, LLC v. Policemen's Annuity and Benefit Fund of Chi.*,
    75 A.3d 101 (Del. 2012)......................................................................................21

*eV3, Inc. v. Lesh*,
    114 A.3d 527 (Del. 2014)....................................................................................21

*Ganino v. Citizens Utils. Co.*,
    288 F.3d 154 (2d Cir. 2000)..................................................................................7

*Gentle Laser Solutions, Inc. v. Sona Int'l Corp.*,
    No. 06-665, 2008 U.S. Dist. LEXIS 47645 (D.N.J. June 19, 2008)................16, 17

*Hardin v. KCS Int'l, Inc.*,
    682 S.E.2d 726 (N.C. App. 2009)........................................................................11

*Hoover v. HSBC Mortg. Corp. (USA)*,
    9 F. Supp. 3d 223, 242 (N.D.N.Y. 2014).............................................................24

*Hopkins v. Duckett*,
    No. A-5883-08T1, 2012 N.J. Super. Unpub. LEXIS 93 (N.J. Sup. Ct. App.
    Div. Jan. 17, 2012).............................................................................................11

*Igbanugo v. Cangemi*,
    No. 01-1753, 2011 Minn. App. Unpub. LEXIS 625 (Minn. Ct. App. June 27,
    2011)...................................................................................................................12

*Immel v. Rud*,
    No. 13-CV-07, 2008 Minn. Dist. LEXIS 102 (Minn. Dist. Ct. Oct. 28, 2008) .......12

*In re Calpine Corp.*,
    No. 07-CV-3088, U.S. Dist. LEXIS 62100 (S.D.N.Y. June 8, 2011) ....................19

*In re Moody's Corp. Sec. Litig.*,
    No. 07 Civ 8375, 2013 U.S. Dist. LEXIS 122449 (S.D.N.Y. Aug 22, 2013) .........15, 16

*In re Sanofi-Aventis Sec. Litig.*,
    774 F. Supp. 2d 549 (S.D.N.Y. 2011)................................................................15, 16

*Iqbal. Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006)..................................................................................17

*Janus Capital Group, Inc. v. First Derivative Traders*,
    131 S. Ct. 2296 (2011) .......................................................................................14

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005).................................................................................13

*MacDraw, Inc. v. CIT Group Equip. Fin.*,
    157 F.3d 956, 964 (2d Cir 1998) ..........................................................................24

*Mills v. Polar Molecular Corp.*,
    12 F.3d 1170 (2d Cir. 1993)........................................................................... passim

*Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*,
    No. 19209, 2002 Del. Ch. LEXIS 91 (Del. Ch. July 2, 2002) .................................24

*Reiger v. Drabinsky (In re Livent Noteholders Sec. Litig.)*,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001) ..............................................................15, 16

*Scagnelli v. Schiavone*,
    No. 09-3660, 2012 U.S. Dist. LEXIS 117019 (D.N.J. Aug. 20, 2012) ...................12

*Stewart v. BF Bolthouse Holdco, LLC*,
    No. 8119, 2013 Del. Ch. LEXIS 215 (Del. Ch. Aug. 30, 2013)...............22, 23, 25

*Stolba v. Wells Fargo & Co.*,
    No. 10-CV-6014, 2011 U.S. Dist. LEXIS 87355 (D.N.J. Aug. 8, 2011) ................12

*Valspar Refinish, Inc. v. Gaylord's, Inc.*,
    764 N.W.2d 359 (Minn. 2009)..............................................................................12

*Waxman v. Envipco Pick Up & Processing Servs.*,
    No. 02 Civ. 10132, 2003 U.S. Dist. LEXIS 19295 (S.D.N.Y. Oct. 23, 2003) ........14

*Weiss v. Nw. Broad. Inc.*,
    140 F. Supp. 2d 336 (D. Del. 2001).....................................................................24

**STATUTES**

15 U.S.C. § 78u-4 ......................................................................................................9

**RULES**

Fed. R.Civ. P. 9(b) ....................................................................................................9

Fed. R. Civ. P. 10b-5.............................................................................................10, 14

Fed. R. Civ. P. 12(b)(6)..................................................................................................7, 8

## INTRODUCTION

Plaintiffs are former mid-level managers of Defendant Covis Pharmaceuticals, Inc. ("Covis"). Following the end of their Covis employment -- and in accordance with the express terms of the contracts that governed their relationships with Covis -- Plaintiffs received aggregate payments totaling $290,000, representing the fair market value of the profits interests each had been granted as participants in the Covis management equity program. When a third party later purchased Covis' assets, Plaintiffs filed this lawsuit asserting that the profits interests, for which they had already been paid fair market value, should have entitled them to payments exceeding $30 million. Plaintiffs manufactured this absurd sum by completely ignoring the express terms of the parties' agreements, including by double-counting predecessor interests that had been cancelled and replaced, counting interests that had never vested (and, in the case of one Plaintiff, did not vest because he quit his employment), valuing the interests as of an incorrect valuation date, using an incorrect valuation, and otherwise asserting wildly inappropriate claims.

The Complaint does not, and cannot, plead the facts necessary to maintain any of its causes of action, including federal and state securities fraud, common-law fraud, breach of contract, and the various quasi-contract claims asserted therein. Accordingly, for the reasons set forth in this memorandum, the Complaint should be dismissed in its entirety.

First, the Complaint cannot successfully assert that the $290,000 paid to Plaintiffs establishes fraudulent intent to deceive, whether under federal or state securities fraud or common-law fraud. Rather, the payment establishes the desire and intent to satisfy, and the actual satisfaction of, the valuation provisions of the contracts. There is no fact pled to establish any fraud or deceit; instead, the facts pled by Plaintiffs only evidence a disagreement with the amount of payment the controlling agreements required. Courts in this District have repeatedly dismissed nearly identical attempts to assert fraud claims arising out of assertions of contractual

non-performance, because the parties' rights and remedies should be governed by the terms of their bargain embodied in the contract, and not the rules of tort.  Accordingly, the Court must dismiss all of the Complaint's fraud claims.

Second, the Complaint fails to plead facts that, if true, would establish any breach of contract.  In fact, it is Plaintiffs' theory of the case that violates the express terms of the controlling agreements and the parties' bargain.  The applicable contracts required that each Plaintiff's profits interests be valued as of his or her "[t]ermination [d]ate," with fair market value determined "in good faith, taking into account all relevant factors," including "the most recent valuation" of Covis.  Accordingly, it is not enough for Plaintiffs to say that they disagree with the $290,000 in payments; instead, they must plead facts to plausibly show that the payments were the product of bad faith.  Notably, the Complaint concedes facts demonstrating good faith under the contracts -- specifically, that the payments were calculated from the most recent valuations performed as of the Plaintiffs' respective termination dates, and which were applied to those profits interests that were both valid and vested.  However, to reach its wildly insupportable conclusion that the payments were calculated in bad faith, the Complaint asks that the Court ignore the express terms of the contracts.  Under law, Plaintiffs cannot plead a breach-of-contract claim contrary to the contracts under which they purport to sue and, therefore, the Complaint fails to allege a violation of the contractual obligation to value Plaintiffs' interests in good faith.

Third, the Complaint's quasi-contract claims should be dismissed, because the parties' agreements control their respective rights and obligations.  Plaintiffs cannot achieve a result different from that mandated by those agreements by asserting such theories.

Accordingly, the Complaint must be dismissed in its entirety.

## STATEMENT OF THE CASE

The following facts derive from the allegations of the Complaint and the several agreements that are incorporated by, or are integral to, the Complaint.[1]

### I.   The Initial Corporate Structure

Plaintiffs formerly worked for Covis, a start-up pharmaceutical distribution company founded in 2011 and affiliated with a Switzerland-based pharmaceutical company, Covis Pharma S.à.r.l. ("Covis S.à.r.l."). The Covis S.à.r.l. business plan encompassed the acquisition of the commercial rights to certain pharmaceuticals that had gone off-patent, but which remained viable for certain acute-care indications and, with the distribution assistance of Covis, could be further developed through focused marketing efforts. (Compl., ¶¶ 2-3, 38).

Covis distributed the pharmaceuticals in the United States pursuant to a Supply and Distribution Agreement with Covis S.à.r.l. (Compl., ¶¶ 40-41). Initially, Covis and Covis S.à.r.l. were held by a common holding company, Covis Holdings, L.P., which had two classes of limited partners: Class A partners, reserved for parties that contributed capital,[2] and a single Class B partner, Defendant Covis Management Investors LLC ("MIP I"), created to provide profits incentives to certain Covis employees. (Declaration of Gavin J. Rooney ("Rooney Decl."), Ex. A).

Following their hire, each Plaintiff received certain Profits Interests through Award Agreements with MIP I (the "MIP I Profits Interests"). (Compl., ¶ 87). Other current and

---

[1] When adjudicating a motion to dismiss, a district court may consider extrinsic documents if they are *(1)* attached to the pleading, *(2)* incorporated by reference in the pleading, or *(3)* the court deems the evidence integral to at least one claim in the pleading. *Asarco LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014) (citing *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir 2013)). "When a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the defendant may produce the [document] when attacking the complaint for its failure to state a claim, because plaintiff should not so easily be allowed to escape the consequences of its own failure." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991).

[2] One of the Class A limited partners was Defendant Cerberus Covis LLC.

former members of the management teams of Covis and Covis S.à.r.l. who are not plaintiffs in this or any other action received similar awards. The Award Agreements provided for the vesting of such Profits Interests both by the passage of time and by the satisfaction of certain performance criteria. The Award Agreements made clear that continued employment was a condition of further vesting, and that no further Profits Interests would vest if a Plaintiff's employment was terminated, for any reason, voluntarily or involuntarily:

> The Profits Interests are subject to forfeiture. If [Plaintiff's] employment with Holdings (or, as applicable, its Subsidiaries) is Terminated *for any reason* . . . then all of [Plaintiff's] Unvested Profits Interests as of the date of such Termination (the "Termination Date") shall no longer be eligible for vesting and shall automatically and immediately . . . be forfeited and relinquished to the Company . . . .

(Rooney Decl., Exs. B-F, § 4(a) (emphasis added)). Similar provisions forfeiting any unvested interests upon termination of employment appeared in the MIP I Operating Agreement. (*Id.*, Ex. A, § 8.2(a)). The Award Agreements provided that all unvested, timed-based (but not performance-based) Profits Interests would immediately vest upon a Winding Up Event -- provided, however, that the Plaintiff "has not . . . been terminated with or without cause, [or] resigned." (*Id.*, Exs. B-F, § 3).

The Award Agreements gave MIP I the right to redeem the Profits Interests belonging to any plan participant (including each of the Plaintiffs), and that in such event the interest holder would be paid "the Fair Market Value of such interests as of the [former employee's] Termination Date . . . ." (*Id.*, § 4(a)). The MIP I Operating Agreement, in turn, provided that the Fair Market Value of Plaintiffs' Profits Interests would be "determined *in good faith* by the Board of Managers, taking into account all relevant factors, including, without limitation, the most recent valuation, prior to such determination, of the Company and for its equity interest . . . ." (*Id.*, Ex. A, pages A-2 and A-3 (emphasis added); Compl., ¶ 92).

-4-

## II.    <u>The 2013 Restructuring</u>

In 2013, and pursuant to a Master Restructuring Agreement, Covis executed a corporate restructuring.   (Compl., ¶ 79).   A new entity, Defendant Covis US Holdings LLC, thereby became the owner of Covis; as before, that holding entity's equity membership was divided into Class A and Class B units.   The Class A limited partners of Covis Holdings, L.P. became the Class A members of Covis US Holdings LLC, while another new entity, Defendant Covis Management Investors US LLC ("<u>MIP II</u>"), assumed ownership of its Class B membership units.

As a condition precedent to the transaction, Plaintiffs voluntarily surrendered their MIP I Profits Interests in exchange for equivalent Profits Interests in MIP II ("<u>MIP II Profits Interests</u>").   (Compl., ¶¶ 82-87; Rooney Decl., Ex. G, at Exhibit B-1 thereto; *id.*, Exs. I-M.).   The Master Restructuring Agreement attached as an exhibit the new form of Award Agreements for MIP II to be signed by each Plaintiff, as those awards were critical aspects and conditions of the overall restructuring transaction.   (Rooney Decl., Ex. G, at Exhibit B-1 thereto).   The Complaint affirms that Plaintiffs accepted those new Profits Interests as part of the restructuring.   (Compl., ¶ 84).   The Master Restructuring Agreement made clear that the MIP I Profits Interests had been "automatically redeemed without the payment of any consideration," with Plaintiffs having "no further rights with respect to the MIP LLC Profits Interests."   That agreement also made clear that Plaintiffs "irrevocably and forever waive[d], discharge[d], release[d] and [gave] up any and all Released Claims . . . relating to his or her MIP LLC Profits Interests," and further agreed to "refrain from asserting or assisting in the assertion of any claim or demand, or commencing, instituting or causing to be commenced, any proceeding of any kind" involving the MIP I Profits Interests.   (Rooney Decl., Ex. G, §§ 3.1 and 3.3).

The MIP II Award Agreements and MIP II Operating Agreement followed closely the format of the equivalent contracts that had governed the MIP I Profits Interests -- including

identical provisions regarding (i) the forfeiture of unvested Profits Interests upon termination of employment; (ii) the establishment of the date of employment termination as the controlling valuation date for those interests; and (iii) the requirement that those interests be redeemed at Fair Market Value in certain circumstances, as determined by the MIP II board "in good faith." (*Compare* Rooney Decl., Exs. B-F, § 4(a), *with id.*, Exs. I-M, § 4(a)).

## III.    The End of Plaintiffs' Employment and Redemption of Their Profits Interests

According to the Complaint, Covis terminated the employment of Plaintiffs Brown and Elstad on June 24 and June 30, 2014, respectively, citing a restructuring to address operational efficiency.  (Compl., ¶¶ 133-34).  The Complaint further *admits* that Plaintiff Goeken resigned from Covis, thereby terminating his employment, on August 14, 2014.  (*Id.*, ¶ 138).  Covis later eliminated the positions of Plaintiffs Homan and Sampere in a decision announced on November 10, 2014, amid a redirection of marketing efforts.  (*Id.*, ¶ 141).  All, however, were at-will employees, and for the reasons set forth below in Section II.B, the bases of their respective separations from employment are not relevant here.  At the end of their respective employments, a minority of Plaintiffs' Profits Interests had vested; the majority had not.  (*Id.*, ¶ 151).  Pursuant to the terms of the Award Agreements and the MIP II Operating Agreement, those unvested interests were automatically forfeited back to MIP II with no consideration due.

Effective December 31, 2014, Covis exercised its right under the Award Agreements to redeem the vested Profits Interests held by Plaintiffs.  As per the express terms of the Award Agreements, Covis used Plaintiffs' respective dates of termination as the applicable valuation dates for those redemptions.  To determine "Fair Market Value," MIP II's board of managers employed a twofold approach.  First, the board considered Covis' most recent valuation prior to Plaintiffs' respective termination date.  Specifically, MIP II used a $470 million valuation -- which, according to Paragraph 154 of the Complaint was prepared in mid-2014 -- less deductions

for outstanding debt, the Class A units, and a discount for lack of control and liquidity.  (*Id.*, ¶ 154).  Second, and as a double-check on the reasonableness of that calculation as determinative of Fair Market Value, the board looked to the terms of the Supply and Distribution Agreement between Covis and Covis S.à.r.l. which provided that, in the event of a change of control or other similar "Winding Up Event," Covis S.à.r.l. would make a final payment to Covis equal to the last nine months of Covis' gross profits in that relationship.  The board used that formula to assess the Fair Market Value of the Covis enterprise.  (Compl., ¶¶ 159-62).  These two valuation methods mutually supported the amounts ($290,000, in total) paid to Plaintiffs in February 2015 for their MIP II Profits Interests.  (*Id.*, ¶¶ 167-68).  Plaintiffs cashed their checks, accepting their collective $290,000 payment.

In March 2015, months after the contractually required valuation dates, Covis announced the sale of substantially all of its assets to a third-party buyer, Concordia, for $1.2 billion.  Evidently hoping to coerce a further payment out of their former employer in light of that development, Plaintiffs then filed this lawsuit.  The Complaint neglects to mention, however, that the Concordia transaction occurred in the midst of a short-lived, steep, unprecedented, and unsustainable acquisition-driven boom in the highly volatile specialty pharmaceuticals market.  On March 9, 2015, the date the Concordia acquisition was announced (Compl., ¶ 169), Concordia's stock price closed at $80.34 (CAD), up from a close of $50.79 at the end of January 2015.  On August 30, 2015, Concordia's shares reached an all-time high close of $110.60.  By November 17, 2015, however, the date Plaintiffs filed suit, Concordia's stock had plummeted to $43.43, and stood at $41.06 as of January 22, 2016.[3]

---

[3]  *See* http://www.bloomberg.com/quote/CXR:CN (last visited Jan. 22, 2016).  The Court may consider "well-publicized stock prices" in connection with a motion under Rule 12(b)(6).  *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000).

IV.   **The Complaint's Claims of Wrongdoing**

The Complaint asserts twenty separate counts, falling generally into three broad categories:  *(1)* fraud, asserted under the federal securities laws, the securities laws of the current states of residence of each Plaintiff (North Carolina, New Jersey, and Minnesota), and the common law; *(2)* breach of contract, for alleged violations of not only the MIP II Award Agreements, but also the expressly cancelled and superseded MIP I Award Agreements; and *(3)* violation of various quasi-contract doctrines.

All of the counts are generally premised on the allegation that the $290,000 Covis paid to Plaintiffs did not fairly reflect the Fair Market Value of their Profits Interests at the times of their various terminations.  The Complaint remarkably contends that Plaintiffs were due more than $30 million for those interests, a figure Plaintiffs derive from:  (i) valuing both the MIP I Profits Interests *and* the MIP II Profit Interests, even though the MIP I Profits Interests expressly were redeemed and released as a result of the 2013 restructuring -- because, of course, Plaintiffs received the MIP II Profits Interests to leave them in the same position as they had been with their MIP I Profits Interests; (ii) valuing Plaintiffs' vested and unvested Profits Interests, even though the Award Agreements made clear that Plaintiffs forfeited unvested Profits Interests upon termination of employment; and (iii) employing a $1.2 billion valuation for the Covis enterprise that derives from an asset sale that, even according to the Complaint, was announced in March 2015, many months *after* the relevant dates for valuation purposes required by the Award Agreements (*i.e.*, June, August, and November 2014) and which does not appropriately account for the resulting net cash available for distribution to equity holders.  (Compl., ¶¶ 169-77).

## MOTION TO DISMISS STANDARD

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Under this "plausibility" standard, a "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 557).

In addition, securities fraud claims are subject to an even higher pleading standard.  Rule 9(b) requires plaintiffs alleging fraud to state "the circumstances constituting fraud or mistake . . . with particularity."  Moreover, the Private Securities Litigation Reform Act of 1995 ("PSLRA") requires a securities fraud plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  A plaintiff must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).

## ARGUMENT

### I.    ALL OF THE COMPLAINT'S FRAUD COUNTS SHOULD BE DISMISSED.

#### A.    The Complaint Fails to Plead Specific Facts Evidencing a Strong Inference of Fraudulent Intent Not to Perform Under the Award Agreements.

The Complaint's statutory and common-law fraud counts (Counts One to Eleven, and Fourteen to Sixteen) allege that Defendants induced Plaintiffs to sign the MIP II Award Agreements by falsely promising that MIP II would comply with those agreements when paying Plaintiffs the Fair Market Value of their Profits Interests.  (*See, e.g.*, Compl., ¶¶ 182-87).  The

$290,000 in payments made to Plaintiffs, however, demonstrates that MIP II complied by calculating and paying Fair Market Value, as determined under the discretionary "good faith" standard of the applicable contracts.  Moreover, even if there had been a plausible breach of the contract terms governing valuation (which there has not been), a plaintiff cannot transform a breach-of-contract claim into fraud through a conclusory assertion that the defendant never intended to perform.  Accordingly, all of the fraud claims should be dismissed.

A promise to perform a future obligation under a contract, the falsity of which is allegedly proven by the defendant's later failure to perform it, does not state a claim for securities fraud.  In *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993), the Second Circuit affirmed the dismissal of a Rule 10b-5 fraud claim premised upon an employer's breach of a promise to register with the Securities and Exchange Commission certain securities issued to an employee as part of his compensation package.  As the court held:

> The failure to carry out a promise made in connection with a securities transaction is normally a breach of contract.  It does not constitute fraud unless, when the promise was made, the defendant secretly intended not to perform or knew he could not perform. . . . [But such] a 10b-5 complaint . . . must allege facts that raise a strong inference of fraudulent intent.

*Id.* at 1176 (citing *Luce v. Edelstein*, 802 F.2d 49, 55-56 (2d Cir. 1986)).  As the Second Circuit later made clear, "a conclusory allegation of intent to breach at the time of execution will not do."  *Capital Mgmt. Select Fund v. Bennett*, 680 F.3d 214, 226 (2d Cir. 2012).  Instead, the breach itself must demonstrate "strong circumstantial evidence of an intent to deceive," or the complaint must allege "particularized facts supporting a 'cogent and compelling' inference" of fraudulent intent.  *Id.*  The law regarding the Complaint's state-law fraud claims is no different.[4]

---

[4]  *See Hardin v. KCS Int'l, Inc.*, 682 S.E.2d 726, 736 (N.C. App. 2009) (supposedly false promise to perform is not fraud unless "made with an intent to deceive the purchaser and at the time of making the misrepresentation the defendant has no intention of performing his promise"); *Hopkins v. Duckett*, No. A-

The Complaint charges various Defendants with "misrepresent[ing] that they would calculate the fair market value of Plaintiffs' Profits Interests," which is of course the contractual obligation owed by MIP II under Section 4 of the Award Agreements.   (Compl., ¶ 183).  However, the Complaint fails to accompany these conclusory allegations with any pleading of specific facts to create a strong inference of fraudulent intent, as required by *Mills*, *Bennett,* and the PSLRA to turn this breach-of-contract claim into fraud.

Specifically, the alleged breach itself does not constitute "strong circumstantial evidence of an intent to deceive."  *Bennett*, 680 F.3d at 226.  Quite to the contrary, the Complaint admits that MIP II did perform -- by paying Plaintiffs $290,000, which it calculated as the Fair Market Value of Plaintiffs' vested Profits Interests.  There is, of course, a significant difference between an alleged lack of any performance at all and an allegation of insufficient performance, as is the case here.  While the Complaint tries to suggest otherwise with hyperbolic claims of $30 million in compensation supposedly misappropriated from Plaintiffs, that outlandish sum purports to value the *forfeited* MIP I Profits Interests, purports to value the *unvested* MIP II Profits Interests, and employs the wrong valuation date and an *after-the-fact* sale, with the benefit of hindsight with respect to a single highpoint in time, and not the contractually required valuation dates.  More bluntly stated, MIP II's $290,000 payment to Plaintiffs does not imply -- let alone strongly evidence -- that MIP II never intended to comply with the Fair Market Value provisions of the Award Agreements at all.  The alleged breach suggests the very opposite.

---

5883-08T1, 2012 N.J. Super. Unpub. LEXIS 93, at *22-23 (N.J. Sup. Ct. App. Div. Jan. 17, 2012) (same); *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 368-69 (Minn. 2009) (same).  And a claim for negligent represent cannot lie where the claimed false statement is an expression of the speaker's future intent.  *See, e.g.*, *Scagnelli v. Schiavone*, No. 09-3660, 2012 U.S. Dist. LEXIS 117019, at *28-29 (D.N.J. Aug. 20, 2012) (rejecting plaintiff's negligent misrepresentation claim because it was based on an expression of the defendant's future intention); *Stolba v. Wells Fargo & Co.*, No. 10-CV-6014, 2011 U.S. Dist. LEXIS 87355, at *10 (D.N.J. Aug. 8, 2011) (same); *Igbanugo v. Cangemi*, No. A10-2002, 2011 Minn. App. Unpub. LEXIS 625, *9 (Minn. Ct. App. June 27, 2011) (same); *Immel v. Rud*, No. 13-CV-07, 2008 Minn. Dist. LEXIS 102, *38 (Minn. Dist. Ct. Oct. 28, 2008) (same).

Moreover, the Complaint does not plead any particularized facts to raise a "cogent and compelling" inference of intent to defraud.  *Bennett*, 680 F. 3d at 226.  To satisfy this standard, the Complaint would need to contain a statement made by Defendants before Plaintiffs signed the MIP II Award Agreements that demonstrated Defendants' fraudulent intent with regard to the new Profits Interests.  *Mills*, 12 F.3d at 1175 (an alleged misrepresentation "made *after* the contracts were signed. . . . cannot be fraudulent [because] it did not affect the investment decision by the plaintiff" (emphasis in original)).  But none of the statements alleged to have been made before Plaintiffs signed the MIP II Award Agreements establish a "cogent and compelling" intent to never honor the agreements' provisions.

First, the Complaint alleges that Plaintiffs were told that the MIP II Class B Profits Interests "equaled 3.5% of the Covis Enterprise profits" -- for the "*fully vested*" Profits Interests of *all* "[Covis] Management Interests," not just the partially vested interests held by the Plaintiffs here.  (Compl., ¶¶ 110-11, 183).  But the Complaint nowhere explains how or why this statement was false when made, or even rendered incorrect by subsequent events.  Because Plaintiffs (as mid-level managers) held only some of the Covis managers' Profits Interests, most of which never vested, Plaintiffs' share of any profits would necessarily be a small fraction of 3.5%.  Indeed, Plaintiffs nowhere dispute that the $290,000 represents their proportionate share of profits if one employed a $470 million enterprise valuation.

Second, the Complaint claims that Plaintiffs were promised a gross-up for income taxes that was not, in fact, paid.  (Compl., ¶ 182).  But such a requirement appears nowhere in any of the underlying contracts.  The Award Agreements recite that they "constitute the *entire* agreement between the parties," and "supersede all prior written or oral negotiations, commitments, representations and agreements with respect thereto."  (Rooney Decl., Exs. I-M, §

-12-

10 (emphasis added).)  The Award Agreements advised Plaintiffs that they would be responsible for tax on the Profits Interests.  (*Id.*, § 12 and Schedule A thereto).  In fact, Plaintiffs acknowledged that they were *not* relying "on any statements or representations of the Company, US Holdco, or [their] agents or affiliates" with regard to such tax liabilities.  (*Id.*)  Accordingly, this claimed false promise is extinguished by the Award Agreements themselves.  And, in any event, whether the payment was increased by 20% or 30% to account for income taxes hardly suggests fraudulent intent never to honor the contractual obligation to pay Fair Market Value at all.

Third, the Complaint pleads that Defendants misrepresented the terms of an amendment to the Supply and Distribution Agreement between Covis and Covis S.à.r.l. (Compl., ¶ 185).  However, at Paragraph 103 the Complaint concedes that the amendment did not take place until after Plaintiffs signed the MIP II Award Agreements.  Again, Plaintiffs could not have been misled into signing the Award Agreements by subsequent events, nor did they even allege any negative consequences arising from the alleged amendment.  *Mills*, 12 F.3d at 1175.

The bogus nature of these fraud claims is best summed up by the allegation that, upon redemption, MIP II "knowingly misrepresented that the Covis Enterprise was worth only $470 million in order to justify paying Plaintiffs a small fraction of what they bargained for," when Covis announced the sale of its assets in March 2015 for $1.2 billion.  (Compl., ¶¶ 186, 169-73).  As noted, the specialty pharmaceutical market is a volatile one, and a March 2015 valuation sheds no light on Covis' value as of June 2014.  More importantly, however, to state a fraud claim, the Complaint must show that "but for the claimed misrepresentations and omissions," Plaintiffs would not have entered into the MIP II Award Agreements.  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).  No statement concerning proceeds received from a

transaction that occurred in March 2015 could have induced Plaintiffs' 2013 execution of the MIP II Award Agreements.  *Mills*, 12 F.3d at 1175.

Conclusory allegations such as these cannot convert a breach-of-contract claim into fraud.  Judges in this District, and courts in many other districts, have repeatedly dismissed similar attempts to turn breach-of-contract claims into securities fraud where the plaintiff relies upon conclusory allegations akin to those here.  *See Arco Capital Corp. v. Deutsche Bank AG*, 986 F. Supp. 2d 296, 305 (S.D.N.Y. 2013) (dismissing 10b-5 claim, no facts alleged that the defendant had a "secret intention not to perform its contractual obligations"); *Dujardin v. Liberty Media Corp.*, 359 F. Supp. 2d 337, 352 (S.D.N.Y. 2005) (no facts pled to show that defendant never intended to honor a promise to promote the plaintiff to division head); *Waxman v. Envipco Pick Up & Processing Servs.*, No. 02 Civ. 10132, 2003 U.S. Dist. LEXIS 19295, at *24-36 (S.D.N.Y. Oct. 23, 2003) (no facts pled to show that defendant never intended to honor promises to transfer depository receipts and to employ plaintiff in a "key man" position); *DealTime.com Ltd. v. McNulty*, 123 F. Supp. 2d 750, 761 (S.D.N.Y. 2000) (conclusory allegation of an "undisclosed intention" to impose a vesting schedule on stock options insufficient to support 10b-5 claim).  Accordingly, all of the fraud counts fail and should be dismissed.

  **B.**   **The Fraud Claims Against Cerberus Capital Management, L.P. and Cerberus Covis LLC Also Fail as Neither is Even Alleged to Have Made a False Statement and No Facts Are Alleged to Establish Control Person Liability.**

Primary liability under Rule 10b-5 and the other fraud claims is limited to persons who make the false statement to the plaintiff, and the Complaint alleges no false statements made by either Cerberus Capital Management L.P., Cerberus Covis LLC, or even any authorized representative of these entities.  *See Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011); *Central Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164, 177

(1994).  Instead, the Complaint relies upon a conclusory allegation that when a member of the MIP II board (Defendant Ethan Klemperer) gave a presentation to Plaintiffs concerning the 2013 restructuring, he "spoke on behalf of both Covis and Cerberus."  (Compl., ¶ 96).  But the Complaint pleads no facts to support that allegation.  *Defer LP v. Raymond James Fin., Inc.,* No. 08 Civ. 3449, 2010 U.S. Dist. LEXIS 91856, at *30 (S.D.N.Y. Sep. 2, 2010) (dismissing claim attributing an individual's misrepresentation to a corporate entity, where the complaint failed to allege "facts that, if proved, would establish that [the individual] was [the corporation's] agent [or] employee . . . .").  In fact, the Complaint's factual allegations suggest the very opposite -- Mr. Klemperer sat on the board of MIP II (which, of course, makes it expected that he would speak on behalf of MIP II to Plaintiffs concerning their MIP II Profits Interests), and did not hold a position at either of the Cerberus Defendants.  (Compl., ¶¶ 96-103).[5]

Plaintiffs fare no better with the Complaint's control person claims against the Cerberus Defendants under federal and state securities law (Counts Two, Four, Seven, and Ten).  As this Court has repeatedly held, a plaintiff asserting control person liability must plead "*(1)* a primary violation by the controlled person, *(2)* control of the primary violator by the defendant, and *(3)* that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *In re Moody's Corp. Sec. Litig.*, No. 07 Civ. 8375, 2013 U.S. Dist. LEXIS 122449, at *39 (S.D.N.Y. Aug 22, 2013) (Daniels, J.).  *Accord In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 572 (S.D.N.Y. 2011) (a plaintiff must plead "particularized facts" showing a Section 20 defendant's "'actual control' over the statements that were made," or "otherwise played some discernible role in the making of those statements.") (Daniels, J.); *Reiger v.*

---

[5]  At Paragraph 35, the Complaint asserts that Mr. Klemperer held a position at Cerberus Operations and Advisory Company, LLC, an entity not named as a defendant here.

*Drabinsky* (*In re Livent Noteholders Sec. Litig.*), 151 F. Supp. 2d 371, 417 (S.D.N.Y. 2001) (same) (Daniels, J.).[6]

While, as explained above, the Complaint does not establish the liability of any primary violator, it also fails to allege facts that, if true, would plausibly establish that the Cerberus Defendants had actual control over any statements made to Plaintiffs. The Second Count rests its control person claims entirely upon a naked conclusion -- specifically, that "Cerberus is, or was, directly or indirectly, a control person of MIP LLC and MIP US for purposes of section 20(a) of the Act." (Compl., ¶ 193). That is exactly the kind of "formulaic recitation of the elements of the cause of action [that] will not do." *Twombly*, 550 U.S. at 555. Elsewhere, the Complaint asserts that "Cerberus controlled the Covis Enterprise" due to its alleged general partnership interest, and that some of its representatives served as Covis managers or directors. (Compl., ¶ 48). Of course, there is nothing unusual about representatives of an equity holder sitting on a board. Even more importantly, however, such allegations do not demonstrate the requisite "culpable participat[ion] in the controlled person's fraud," *Moody's*, 2013 U.S. Dist. LEXIS 122449, at *39, or the exercise of "'actual control' over the statements that were made." *Sanofi-Aventis*, 744 F. Supp. 2d at 572. Such conclusory allegations do not satisfy the enhanced standards of the PSLRA. *Livent*, 151 F. Supp. 2d at 417.

Accordingly, the securities claims against the Cerberus Defendants must be dismissed.

---

[6] The law regarding the Complaint's state-law control person claims is no different. *See, e.g., Atkinson v. Lackey*, 12-CVS-7600, 2015 N.C.B.C. LEXIS 21, at *30 (N.C. Super. Ct. Feb. 27, 2015) ("Because there are few North Carolina state court decisions interpreting the 'control person' standard under the NCSA, the Court looks to the 'analogous federal control person liability statutes[.]'" (quoting *NNN Durham Office Portfolio 1, LLC*, 12-CVS-3945, 2013 N.C.B.C. LEXIS 11, at *41 (N.C. Super. Ct. 2013))); *Gentle Laser Solutions, Inc. v. Sona Int'l Corp.*, No. 06-665, 2008 U.S. Dist. LEXIS 47645, at *15 (D.N.J. June 19, 2008) ("The level of participation to be a control person under New Jersey's securities laws requires that the plaintiff plead facts that could show some active participation in the management or facts that could show power or influence over policy-making.").

C.   **The Aiding-and-Abetting Claims Against Defendants Alexander Benjamin and Michael Kelly Also Fail Because They Rest on Mere Conclusions Insufficient under *Twombly* and *Iqbal*.**

The Complaint asserts aiding-and-abetting claims against Messrs. Benjamin and Kelly under various state securities laws and common-law fraud theories (Counts Five, Eight, Eleven, Fifteen).  Of course, these claims fail in the absence of a primary violation.  But they also fail because the Complaint alleges nothing more than conclusory statements of those individuals' supposed participation in the fraud.  Nothing is alleged about Benjamin and Kelly, except to say that they held positions with a corporate defendant, coupled with conclusory allegations that each "knew of" or "materially aided" the alleged fraudulent statements.  (Compl., ¶¶ 215-18).

This kind of conclusory parroting of the elements of state-law aiding-and-abetting claims does not pass muster under *Twombly* or *Iqbal*.  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292-93 (2d Cir. 2006) (dismissing claim for aiding and abetting common-law fraud where the complaint contained only conclusory allegations that defendants knew of the fraud); *Bradshaw v. Maiden*, 14-CVS-14445, 2015 N.C.B.C. LEXIS 80, at *44 (N.C. Super. Ct. Aug. 10, 2015) (North Carolina law requires "proof that the 'aiding and abetting party [ ] have the same level of culpability or scienter' as the primary tort-feasor." (internal quotation omitted)); *Gentle Laser Solutions,* 2008 U.S. Dist. LEXIS 47645, at *14 (same under New Jersey law).

## II.   THE BREACH-OF-CONTRACT COUNTS SHOULD BE DISMISSED.

A.   **Plaintiffs' Claims For Breach of the MIP I Award Agreements Should Be Dismissed, Since Those Interests Were Redeemed and Released.**

In a transparent attempt to "double dip" on supposed damages, Count Twelve alleges a claim for breach of the MIP I Award Agreements at the same time that Count Thirteen seeks damages for breach of the MIP II Award Agreements.  Of course, the Complaint does not explain how Plaintiffs can purport to sue for *both* the MIP I *and* MIP II Profits Interests, when

the MIP II interests were expressly issued to replace and supersede the MIP I interests.  But such intellectual honesty and good-faith pleading is nowhere to be found in the Complaint.  In fact, Plaintiffs accepted their MIP II Profits Interests, a fact repeatedly admitted by the Complaint because it is the supposed detrimental reliance that underlies the many fraud counts as well as the foundation of Count Thirteen's breach-of-contract claim.  Plaintiffs' acceptance of the MIP II Profits Interests affirmed their surrender of their MIP I Profits Interests, which the Master Restructuring Agreement makes clear were "automatically redeemed" without consideration and "release[d]."  (Rooney Decl., Ex. G, §§ 3.1 and 3.3).

More bluntly stated, the Complaint cannot state a claim for breach of the MIP I Award Agreements when that claim is flatly contradicted by the terms of the Master Restructuring Agreement, which made the Award Agreements exhibits because they were conditions precedent to the restructuring.  That contract is therefore "integral to the [C]omplaint," which sues for breach of the MIP II Award Agreements and for the value of the MIP II Profits Interests, and Plaintiffs "should not so easily be allowed to escape the consequences of [their] own failure" to attach the Master Restructuring Agreement to the Complaint.  *Cortec Indus.*, 949 F.2d at 47.[7] Plaintiffs' crass attempt to double their breach-of-contract claims by suing for both their MIP I and MIP II Profits Interests fails in light of the Master Restructuring Agreement's clear provisions demonstrating that those interests were redeemed and released.

**B.     Plaintiffs' Claim for the Value of Their Contractually Terminated And Unvested Profits Interests Should Be Dismissed.**

As an evident part of the breach-of-contract claims of Counts Twelve and Thirteen, the Complaint pleads that Plaintiffs should be paid the value of their unvested, time-based Profits

---

[7]  While Plaintiffs claim they did not see the MRA, it was in fact signed by (at least) Mr. Goeken, and all Plaintiffs signed MIP II Award Agreements made exhibits to it.  Moreover, Plaintiffs effectively concede that the MIP II Profits Interests awarded in the restructuring would put them in the same financial position.  (*See* Compl., ¶ 101).  In other words, the Interests were a replacement, not an additional award.

Interests.  The Complaint asserts that Covis terminated Plaintiffs' employment on pretextual grounds, simply to avoid the accelerated vesting of those time-based interests upon a Winding Up Event.  The theory fails as a matter of law, pleading, and logic.

First, it fails under the clear terms of the Award Agreements, which require the forfeiture of all unvested interests if a Plaintiff's employment "is [t]erminated *for any reason*."  (Rooney Decl., Exs. I-M, § 4(a) (emphasis added)).  Indeed, those contracts recognized that the Plaintiffs' employment could be terminated "for Cause" or "not for Cause."  (*Id.*).  Although Plaintiffs either resigned or their at-will employment was terminated, the parties bargained that Covis' motive for doing so would be irrelevant because the unvested interests were forfeited upon termination for "any reason."  That is the express agreement Plaintiffs accepted, and the Court may not afford Plaintiffs a better bargain than they negotiated for themselves.  *In re Calpine Corp.*, No. 07-CV-3088, U.S. Dist. LEXIS 62100, at *4 (S.D.N.Y. June 8, 2011) ("[C]ourts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself.").

Where, as here, an employee has at-will status, the employer can exercise its right to terminate the relationship, even if that action prevents the vesting of securities that would otherwise benefit the employee.  To hold otherwise, of course, would mean that the existence of the unvested interests somehow alters or qualifies the at-will nature of the employment relationship.  The district court reached this very conclusion in *Bernard v. Netegrity, Inc.*, No. 00 Civ. 3001, 2000 U.S. Dist. LEXIS 17299, *2, *8 (S.D.N.Y. Nov. 30, 2000), where the plaintiff alleged that his employer fired him "in order to preclude him for exercising the now-valuable options upon their vesting."  The court, however, dismissed the complaint because the at-will relationship afforded the employer the right to do so -- a right unchanged by the fact that the

plaintiff would forfeit his unvested stock options.  Similarly here, the Award Agreements recognized that Covis had the right to terminate these at-will plaintiff employees.  It therefore matters not why Covis chose to end the employment relationship.

Nor, in any event, does the pretext theory pass muster under *Twombly* and *Iqbal*.  As an initial matter, Mr. Goeken quit his job -- he was not terminated.  (Compl., ¶ 138).  Moreover, the Complaint cites no potential deal on the eve of the terminations that might have constituted a Winding Up Event.  Covis terminated Elstad and Brown in June 2014, Goeken quit in August 2014, and Covis announced Homan's and Sampere's terminations in November 2014 -- months before the Complaint alleges the first hint of the sale of Covis' assets in January 2015, and the announced agreement in March 2015.  (Compl., ¶¶ 169-70).  Accordingly, the Complaint alleges no facts -- nor could it -- to plausibly suggest that Covis terminated any plaintiff on the eve of a Winding Up Event for the purposes of frustrating immediate vesting of all Profits Interests.

### C. Plaintiffs' Claims for Fair Market Value of Their MIP II Profits Interests Should Be Dismissed, Since the Complaint Does Not Plead Facts Showing Bad Faith by the MIP II Board.

Count Thirteen alleges that MIP II breached the Award Agreements by failing to value the Profits Interests in "good faith."  (Compl., ¶ 286).  As a preliminary matter, however, Count Thirteen must be dismissed with respect to Covis and Covis US Holdings LLC; MIP II was the counterparty to the Award Agreements, and absent extraordinary circumstances not pled here, only a party to a contract can be liable for breach.  *CMS Inv. Holdings, LLC v. Castle*, No. 9468, 2015 Del. Ch. LEXIS 169, at *45 (Del. Ch. June 23, 2015).  Moreover, Count Thirteen does not even plead a plausible claim against MIP II, and it must be dismissed in its entirety.  (Compl., ¶¶ 288-91).

The Award Agreements do not afford Plaintiffs the right to sue for a *de novo* judicial determination of the Fair Market Value of their MIP II Profits Interests.  As noted, the MIP II

Operating Agreement requires the MIP II board to exercise "good faith" in determining the value of the interests, "taking into account all relevant factors." (Rooney Decl., Ex. H, pages A-2 and A-3). Accordingly, Plaintiffs can only plead a plausible claim for relief by alleging specific facts to show that the MIP II board violated this contractual duty by acting in bad faith.

Under Delaware law,[8] a plaintiff asserting that a defendant violated a contractual obligation to make a decision or perform an act in "good faith" must demonstrate "its 'opposite characteristic -- bad faith.'" *eV3, Inc. v. Lesh*, 114 A.3d 527, 539 (Del. 2014) (quoting *DV Realty Advisors, LLC v. Policemen's Annuity and Benefit Fund of Chi.*, 75 A.3d 101, 110 (Del. 2012)). To do so, a plaintiff must demonstrate "conduct that falls outside business judgment protection, namely, an action 'so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.'" *DV Realty*, 75 A.3d at 110 (quoting *Brinckerhoff v. Enbridge Energy Co., Inc.*, 67 A.3d 369, 373 (Del. 2013)).

The Complaint does not allege facts that, if true, plausibly establish bad faith on the part of MIP II -- or, stated more specifically, that the $290,000 paid to Plaintiffs was "so far beyond the bounds of reasonable judgment" that it could only be the product of bad faith. *DV Realty*, 75 A.3d at 110. Quite to the contrary, the Complaint's factual allegations demonstrate that the MIP II board acted in good faith. MIP II used the Plaintiffs' respective dates of termination as the applicable valuation dates, and applied the most recent Covis valuation. (Compl., ¶ 154). That, of course, is exactly what the controlling contracts require. Section 4 of the Award Agreements makes clear that Fair Market Value will be determined "as of the [Plaintiffs'] Termination Date" -- *i.e.*, June, August and November 2014. (Rooney Decl., Exs. I-M). Moreover, the MIP II Operating Agreement provides that Fair Market Value would be determined with regard to "the

---

[8] The MIP II Operating Agreement designates Delaware law as its governing law. (Rooney Decl., Ex. H, § 11.5.)

most recent valuation, *prior to such determination*, of the Company. . . ." (*Id.*, Ex. H, pages A-2 and A-3) (emphasis added).  Again, that is *exactly* what the MIP II board did here, since the $470 million valuation of mid-2014 was the most recent valuation of the Covis enterprise as of the Plaintiffs' respective terminations of employment in June, August, and November 2014. (Compl., ¶ 154).

The Complaint's attempt to plead bad faith asks the Court to disregard those controlling provisions of the Award Agreements and the MIP II Operating Agreement.  The Complaint asserts that the relevant valuation date was February 26, 2015, "[w]hen Covis exercised its call option and cancelled Plaintiffs' MIP US Profits Interests," and then contends that MIP II should have employed the March 2015 announced sale of Covis' assets for $1.2 billion as the relevant valuation.  (Compl., ¶¶ 168-77).  But the relevant date for valuation is not when MIP II chose to redeem the profits interests, but rather the date when Plaintiffs ceased their employment.  A sale announced in March 2015 is not relevant to value determined as of June 2014, nine months earlier.  *Compare Stewart v. BF Bolthouse Holdco, LLC*, No. 8119, 2013 Del. Ch. LEXIS 215, at *18 (Del. Ch. Aug. 30, 2013) (claim that corporation valued the plaintiff's units in bad faith adequately pled when the company stated that the units were worthless but a contemporaneous email, prepared under the CEO's direction, valued them at $100; while also rejecting allegations that were "either too far before or too far after" the valuation date); *Clean Harbors, Inc. v. Safety-Kleen, Inc.*, No. 6117, 2011 Del Ch. LEXIS 184 (Del. Ch. Dec. 9, 2011) (same).

Certainly, the MIP II board's use of the contractually required valuation dates, and employment of the most recent valuation as of those dates, does not suggest that it acted in bad faith.  Simply pointing to a sale to a third party that occurred months later does not change the analysis.  *Accord Stewart*, 2013 Del. Ch. LEXIS 215, at *18-19 (company's later acquisition for

$1.2 billion irrelevant to whether the board acted in bad faith by earlier determining that Plaintiffs' profits interests were worthless).  This is particularly so where it would have been markedly unreasonable for the MIP II board to determine its internal valuations based upon a much later third party sale, particularly given the volatile market for specialty pharmaceutical companies (where the buyer's own stock price, for example, fell from $110.60 to $43.43 in a three-month period).  Accordingly, the Complaint fails to allege facts which, if true, plausibly show that the MIP II board acted in bad faith, and Count Thirteen should therefore be dismissed.

## III.   THE QUASI-CONTRACT CLAIMS SHOULD BE DISMISSED BECAUSE PLAINTIFFS' RIGHTS ARE CONTROLLED BY CONTRACT.

The Complaint sues to enforce the Award Agreements but, at the same time, also pleads claims under a series of quasi-contract theories: unjust enrichment, promissory estoppel, equitable estoppel, and breach of the implied covenant of good faith and fair dealing.  Each of these claims allege purported flaws in the bargaining process leading to the Award Agreements or challenge the amount paid to Plaintiffs by MIP II as "Fair Market Value."  But Plaintiffs' rights and remedies are governed by the Award Agreements and the MIP II Operating Agreement, and the law does not permit Plaintiffs to end-run the bargain represented in those contracts by asserting this kind of hodgepodge of quasi-contract claims.

The existence of valid and enforceable contracts governing the parties' relationship means that the unjust enrichment (Count Eighteen), promissory estoppel (Count Nineteen), and equitable estoppel (Count Twenty) claims cannot be maintained.  The function of such claims, of course, is to define the parties' rights and obligations in the absence of a contract doing so.  Accordingly, the existence of a valid and enforceable contract addressing the subject matter of the dispute precludes an unjust enrichment claim under Delaware law.  *See, e.g., AM Gen. Holdings, LLC v. Renco Group, Inc.*, No. 7639, 2013 Del. Ch. LEXIS 266, at *52-54 (Del. Ch.

Oct. 31, 2013) ("the contractual remedies remain the sole remedies even if the [plaintiff pursues a] claim of unjust enrichment").[9]   Nor can Plaintiffs avoid the terms of their bargain under a theory of promissory estoppel, and particularly so when the alleged "promise" relates to the defendant's performance under the contract.  *Weiss v. Nw. Broad. Inc.*, 140 F. Supp. 2d 336, 344 (D. Del. 2001) ("[b]ecause the court has determined that the [agreement] is a valid contract, [the plaintiff] cannot recover under a theory of promissory estoppel").   Moreover, a claim for equitable estoppel is not viable where, as here, the alleged representations are "inconsistent with a negotiated contract" and the contract contains a broad integration clause.  *Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*, No. 19209, 2002 Del. Ch. LEXIS 91, at *23 (Del. Ch. July 2, 2002).  Consequently, Plaintiffs cannot claim they were promised a gross-up for income taxes contrary to the terms of the Award Agreements; cannot seek compensation for their Profits Interests except as set forth in those same integrated contracts; or seek value for Profits Interests that were forfeited, or which did not vest, under the controlling contracts.

The Complaint's claim for violation of the implied covenant of good faith and fair dealing (Count Seventeen) contends that Plaintiffs' "terminations [of employment] had no business purpose whatsoever," and that Covis "terminated [them] in bad faith." (Compl., ¶¶ 330,

---

[9]   We here analyze these quasi-contract claims under Delaware law, since the MIP II Operating Agreement (and, therefore, the Award Agreements which incorporate that contract) designate Delaware law as the governing law.  However, the result is no different if the Court were to apply New York law here.  *See MacDraw, Inc. v. CIT Group Equip. Fin.*, 157 F.3d 956, 964 (2d Cir 1998) (stating that it is a well-settled principle of New York law that a valid and enforceable contract precludes recovery under a theory of unjust enrichment for subject matter governed by the contract); *Brinsights LLC v. Charming Shoppes of Del., Inc.*, 06 Civ. 1745, 2008 U.S. Dist. LEXIS 3787, at *14-15 (S.D.N.Y. Jan. 16, 2008) ("In the face of this specific written language acknowledged and accepted by plaintiff, reliance upon oral representations that flatly contradict the written agreement is unreasonable as a matter of law."); *Hoover v. HSBC Mortg. Corp. (USA)*, 9 F. Supp. 3d 223, 242 (N.D.N.Y. 2014) (dismissing breach of implied covenant of good faith and fair dealing claim because such "a claim cannot conflict with express terms of the contract and cannot impose independent obligations beyond the contract").

332).[10]   But again, this claim is plainly inconsistent with the Award Agreements, which recognized that Plaintiffs could be terminated "for any reason," including "for Cause" or "not for Cause."  (Rooney Decl., Exs. I-M, § 4(a)).  As at-will employees, Covis remained free to end Plaintiffs' employment, at its discretion.  Although Mr. Goeken resigned and Covis ended the employment of the other Plaintiffs for legitimate business reasons, nevertheless an employer may terminate an at-will employee even if doing so prevents the further vesting of options, profits interests, or other equity interests.  *Bernard*, 2000 U.S. Dist. LEXIS 17299, at *1.  As the Delaware Court of Chancery held in *Stewart*, the valuation provisions of the contract granting the Plaintiff the interests leave no room for the assertion of a claim under the implied covenant of good faith and fair dealing.  *See* 2013 Del. Ch. LEXIS 215, at *53 ("The Court cannot conceive of any circumstances where [defendant] could be deemed to have acted in bad faith but not be in breach of contract; thus, the implied covenant is not applicable.").  Because Plaintiffs' "reasonable expectations of [their] bargain" were set forth definitively in the Award Agreements and MIP II Operating Agreement, they are now precluded from claiming that Defendants' conduct somehow also breached the implied covenant of good faith and good dealing.  *Id.* at *52-53.

## CONCLUSION

For the reasons discussed above, the Complaint must be dismissed in its entirety.

Respectfully submitted,

**LOWENSTEIN SANDLER LLP**
Attorneys for Defendants


By: ___/s/Gavin J. Rooney___

Dated: January 25, 2016

---

[10]   Of course, since Mr. Goeken *resigned* and was never terminated, Plaintiffs' attempt to invoke the implied covenant on his behalf is frivolous.