# EXHIBIT H

# PART 3

may hold such reserves for such period that it shall reasonably deem advisable for the payment of such obligations and liabilities as they become due and at the expiration of such period, the balance of such reserves, if any, shall be distributed as provided in this Section 9.2; and

(b) then, the balance, if any, to the Members in accordance with Section 4.1(b).

9.3 Final Accountings. Upon both the dissolution and termination of the Company, a proper accounting shall be made by the Company from the date of the last previous accounting to the date of the dissolution or termination, as the case may be.

9.4 Certificate of Cancellation. Upon completion of the distribution pursuant to Section 9.2, the Company is terminated, and the Board of Managers or liquidator, as the case may be, shall file or cause to be filed a certificate of cancellation with the Secretary of State of the State of Delaware and cancel any other filings and take such other actions as may be necessary to terminate the Company.

## ARTICLE X

## REPRESENTATIONS OF MEMBERS

Each of the Members represents and warrants with respect to itself as follows:

10.1 Authorization. Such Member has full power and authority to perform its obligations under this Operating Agreement. This Operating Agreement is valid, binding and enforceable against such Member in accordance with its terms, except that such enforceability may be limited by applicable bankruptcy, insolvency, reorganization and similar laws of general application relating to or affecting the rights and remedies of creditors.

10.2 Compliance with Laws and Other Instruments. The execution and delivery of this Operating Agreement, and the performance of its obligations hereunder, will not (a) conflict with (i) any provision of any governing instrument applicable to such Member or (ii) any permit, franchise, judgment, decree, statute, rule or regulation applicable to such Member or its business or property, or (b) result in any material breach of any terms or provisions of, or constitute a material default under, any material contract, agreement or instrument to which such Member is a party or by which it is bound or to which any assets of such Member are subject.

10.3 Consents.

(a) No filing with, or consent, approval, authorization or action of, any Governmental Entity or third party is required to be made or obtained by a Member with respect to such Member's execution and delivery of this Operating Agreement that has not been previously made or obtained or validly waived.

(b) Such Member has, if required by applicable law, obtained the consent of such Member's spouse to this Operating Agreement and delivered to the Company a duly executed copy of a spousal consent in the form attached hereto as Exhibit C.

10.4 Investment. All Members acknowledge that the Membership Interests have not been registered under the Securities Act in reliance on the exemption afforded by Section 4(2) of the Securities Act and/or Rule 701. Each Member acquiring Membership Interests (i) is acquiring the Membership Interests solely for such Member's own account for investment purposes, and not with a view to the distribution thereof, and will not sell or otherwise dispose of any Membership Interests except in compliance with the Securities Act, the rules and regulations of the Securities and Exchange Commission thereunder, the relevant laws of all other applicable jurisdictions, and the terms of this Operating Agreement, (ii) has received certain information concerning the Company and has had the opportunity to obtain additional information in order to evaluate the merits and the risks inherent in holding the Membership Interests, and (iii) is able to bear the economic risk and lack of liquidity inherent in holding the Membership Interests, including the complete loss of such Member's investment in the Membership Interests.

## ARTICLE XI

## MISCELLANEOUS

11.1 Action by Written Consent. Any action permitted or required by the Act or this Operating Agreement to be taken by the Members may be taken without a meeting if a consent in writing, setting forth the action taken, is signed by Members holding the minimum number of Vested Profits Interests necessary to authorize such action. If action is taken by written consent pursuant to this Section 11.1, the Company shall promptly notify all nonconsenting Members of such action.

11.2 Notices. Except as expressly provided in this Operating Agreement, all notices, consents, waivers, requests or other instruments or communications given pursuant to this Operating Agreement shall be in writing, signed by the Party giving the same, and shall be delivered by hand or sent by registered or certified United States mail, return receipt requested, postage prepaid, or by a recognized overnight delivery service, addressed, in the case of the Company, to the Company at its principal place of business, and to any of the Members at the address set forth in the Company's books and records. Any Member may, by notice to the Company and each other Member, specify any other address for the receipt of such notices, instruments or communications. Except as expressly provided in this Operating Agreement, any notice, instrument or other communication shall be deemed properly given when sent in the manner provided in this Section 11.2.

11.3 No Appraisal Rights. To the extent any transaction relating to the Company gives rise to rights of appraisal or dissent under Law, each Member hereby irrevocably and permanently waives such rights.

11.4 Interpretation.

(a) Article and Section headings are not to be considered part of this Operating Agreement, are included solely for convenience of reference, and are not intended to be full or accurate descriptions of the contents thereof.

(b) Use of the terms "herein," "hereunder," "hereof" and like terms shall be deemed to refer to this entire Operating Agreement and not merely to the particular provision in which the term is contained, unless the context clearly indicates otherwise.

(c) Use of the word "including" or a like term shall be construed to mean "including but not limited to."

(d) Exhibits and schedules to this Operating Agreement are an integral part of this Operating Agreement.

(e) Words importing a particular gender shall include every other gender and words importing the singular shall include the plural and vice-versa, unless the context clearly indicates otherwise.

(f) Any reference to a provision of the Code, regulations or the Act shall be construed to be a reference to any successor provision thereof.

11.5 Governing Law. THIS OPERATING AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, EXCLUDING ANY CONFLICT OF LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE, CONSTRUCTION OR INTERPRETATION OF THIS OPERATING AGREEMENT TO THE LAWS OF ANOTHER STATE, AND WITH RESPECT TO LAWSUITS ARISING OUT OF THIS OPERATING AGREEMENT, THE PARTIES SHALL SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE STATE OR FEDERAL COURTS LOCATED IN THE STATE OF NEW YORK, COUNTY OF NEW YORK.

11.6 Binding Agreement. This Operating Agreement shall be binding upon and inure to the benefit of the Members and their respective successors and assigns.

11.7 Severability. Each item and provision of this Operating Agreement is intended to be severable. If any term or provision of this Operating Agreement is determined by a court of competent jurisdiction to be unenforceable for any reason whatsoever that term or provision shall be ineffectual and void and the validity of the remainder of this Operating Agreement shall not be adversely affected thereby.

11.8 Entire Agreement. This Operating Agreement (including the Exhibits and schedules attached to this Operating Agreement and applicable Award Agreement(s), if applicable) supersedes any and all other understandings and agreements, either oral or in writing, between the Members with respect to the Membership Interests and the matters set forth herein, and constitutes the sole and only agreement between the Members with respect to the Membership Interests and the matters set forth herein.

11.9 Further Action. Each Member shall execute and deliver all papers, documents and instruments and perform all acts that are necessary or appropriate to implement the terms of this Operating Agreement and the intent of the Members.

11.10 Amendment or Modification. This Operating Agreement (including the Exhibits and schedules hereto) may be amended or modified from time to time by the written consent of the Company and Holdings GP.

11.11 Third Party Beneficiary. Holdings shall be an express third party beneficiary of this Operating Agreement.

11.12 Counterparts. This Operating Agreement may be executed in original or by facsimile in several counterparts, and as so executed shall constitute one agreement, binding on all of the Parties hereto, notwithstanding that all of the Parties are not signatory to the original or to the same counterpart.

[*signature page follows*]

IN WITNESS WHEREOF, Holdings and the Members have entered into this Operating Agreement and hereunto set their hands and seals as of the date first above written.

**COVIS HOLDINGS GP, LLC**

By: Cerberus Series Four Holdings, LLC, its Managing Member

By: Cerberus Institutional Partners, L.P. - Series Four, its Managing Member

By: Cerberus Institutional Associates, L.L.C., its General Partner

By: ______________________
Name: Alexander D. Benjamin
Title: Authorized Signatory

**COVIS US HOLDINGS LLC**

By: ______________________
Name: Alexander D. Benjamin
Title: Authorized Signatory

**MANAGEMENT MEMBERS:**

[signature] 103 Eaton Pl Cary NC 27513

Al Goeken
Address:

Tonya Brown
Address:

Marc Marchand
Address:

Jeff Sampere
Address:

John Elstad
Address:

Elizabeth Homan
Address:

[signature]

Ryan Davis
Address: 4608 Chandler Grove Ct. Raleigh, NC 27612

[signature]

Sarah Norris
Address: 2963 Wycliff Rd Raleigh, NC 27607

**EXHIBIT A**

**DEFINITIONS**

"Accounting Period" means the following fiscal periods: the initial Accounting Period shall commence on the date hereof. Each subsequent Accounting Period shall commence immediately after the close of the next preceding Accounting Period. Each Accounting Period shall close at the close of business on the first to occur of (a) the last day of a Fiscal Year of the Company; (b) the day immediately preceding the effective date of the acceptance of a Capital Contribution from a new or existing Member, other than a Capital Contribution that is *pro rata* among all existing Members; (c) the day immediately preceding the grant of an interest in the Company (other than a *de minimis* interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in the capacity of a Member or by a new Member acting in the capacity of a Member or in anticipation of being a Member; (d) the day immediately preceding the Transfer of a Membership Interest; (e) the day immediately preceding the effective date of the partial or complete withdrawal of a Member; or (f) the date of the Company's liquidation.

"Act" means the Delaware Limited Liability Company Act, Del. Code Ann. Tit. 6. §§18-101 to 18-1109.

"Affiliate" of a specified Person means any other Person who directly or indirectly controls, is controlled by, or is under common control with, such specified Person. For purposes of the preceding sentence, "control" of a Person means possession, directly or indirectly (through one or more intermediaries), of the power to direct or cause the direction of management and policies of such Person through ownership of voting securities (or other ownership interests), contract, voting trust or otherwise.

"Business Day" means any calendar day other than a Saturday, a Sunday or any other day on which commercial banks in New York, New York are authorized or required to close.

"Capital Account" means, with respect to any Member, the account established for such Member in the books and records of the Company which is debited and credited with such Member's allocable shares of Profits and Losses and distributions to such Member as provided in this Operating Agreement.

"Cause" has, if applicable, the meaning ascribed to such term in a Management Member's employment agreement with the Company and otherwise means any of the following: (A) the Management Member's being or having been engaged in conduct constituting breach of fiduciary duty, willful misconduct or gross negligence relating to the Company (or Holdings or any of its Subsidiaries, to the extent such Management Member is employed by or providing services to Holdings or any such Subsidiaries) or to the performance of the Management Member's duties; (B) any indictment for, conviction of, or plea of guilty or *nolo contendere* to, (1) any felony or (2) any crime (whether or not a felony) involving fraud, theft, breach of trust or similar acts, whether of the United States or any state thereof or any similar foreign Law to which the Management Member may be subject; (C) the Management Member's willful failure

to (1) follow the reasonable and lawful directives of Holdings or of the Subsidiary at which he or she is employed or provides services, or of the Holdings Management Board or (2) comply with the reasonable and lawful written rules, regulations, policies or procedures of Holdings or the Subsidiary at which he or she is employed or to which he or she provides services which, if not complied with, would reasonably be expected to have a material effect on the business or financial condition of Holdings and its Subsidiaries taken as a whole, or (D) the Management Member's material breach of this Operating Agreement, his or her Employment Agreement or his or her Award Agreement, as applicable, (it being understood that poor performance alone shall not give rise to a termination for Cause pursuant to Clause (A) or Clause (C)); provided, however, that, prior to the termination of a Management Member for Cause which is based on clause (C) hereof, the Company shall provide such Management Member with at least twenty (20) days after receipt of written notice detailing such grounds to cure such grounds.

"Class A Units" means a Class A Unit of Holdings.

"Class B Units" means a Class B Unit of Holdings.

"Code" means the United States Internal Revenue Code of 1986, as amended from time to time.

"Company Assets" means all assets owned from time to time by the Company, including without limitation the Class B Units held by the Company.

"Conversion" means a change in the legal status of the Company from a Delaware limited liability company into a business corporation or such other form of business organization, organized under the laws of the State of Delaware or one of the other states or territories of the United States or the District of Columbia, in such form and manner (including, without limitation, by amalgamation, merger, reorganization, liquidation, transfer of shares or assets of the Company or any of its Subsidiaries, or by any other means permissible under applicable law) and with such classes of stock or other equity interests having such rights, preferences and other terms as may be approved by the Board of Managers and the Holdings Management Board; provided, however, that, immediately following the effective time of any Conversion, the equity interests of the shareholders or equityholders in the corporation or other business organization into which the Company is converted shall, in accordance with Section 3.8 of this Operating Agreement, have relative economic interest and rights and preferences equal to or better than the Member's Membership Interests as of the effective time of the Conversion, after taking into account the relative tax attributes of such pre- and post-conversion equity interests. Following any Conversion, all references herein to Membership Interests shall be deemed to be references to securities representing such membership interests.

"Covis Lux" means Covis Pharma S.à. r.l., a company organized under the laws of Luxembourg.

"Covis US" means Covis Pharmaceuticals, Inc., a Delaware corporation.

"Fair Market Value," means, with respect to any Profits Interest or any asset or liability, as applicable, the fair market value of such Profits Interest, asset or liability, as determined in good faith by the Board of Managers, taking into account all relevant factors,

including without limitation the most recent valuation, prior to such determination, of the Company and/or its equity interests (provided that the Board of Managers shall provide written notice to the Management Members of such determination).

"Fiscal Year" means the fiscal year of the Company, as determined by the Board of Managers.

"Governmental Entity" means the United States of America or any other nation, any state, province or other political subdivision, any international or *supra* national entity, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government, including any court, in each case, having jurisdiction over the Company or any of the property or other assets of the Company.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, adjusted as provided in this Operating Agreement.

"Holdings LLC Agreement" means the Amended and Restated Limited Liability Company Operating Agreement of Covis US Holdings LLC, as amended from time to time.

"Law" means any applicable law, statute, ordinance, rule, regulation, code, order, judgment, tax ruling, injunction or decree of any Governmental Entity, including any Law relating to the protection of the environment.

"Legal Representative" means the guardian, executor, administrator or other legal representative of a Member which is an individual, and all references herein to such Member shall include a reference to such Member's Legal Representative, if any, unless the context otherwise requires.

"Membership Interests" means the class or classes of limited liability company interests of a Member in the Company, as set forth opposite such Member's name on the Schedule of Members from time to time, representing the right of such Member to any and all of the benefits to which such Member may be entitled as provided in this Operating Agreement and in the Act, together with the obligations of such Member to comply with all provisions of this Operating Agreement and the Act.

"Option Period" means with respect to any of a Management Member's Profits Interests, the thirty-day period beginning on the effective date of Termination.

"Person" means any natural person, corporation, partnership, joint venture or enterprise, limited liability company, unincorporated association, trust, estate, Governmental Entity or other entity or organization, and shall include the successor (by merger or otherwise) of any entity or organization.

"Profits and Losses" means, for each Accounting Period, an amount equal to the Company's taxable income or loss for such Accounting Period, determined in accordance with Code section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a) Income that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses shall be added to such taxable income or loss.

(b) Any expenditures of the Company described in Code section 705(a)(2)(B), or that are treated as Code section 705(a)(2)(B) expenditures pursuant to Regulations section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits and Losses pursuant to this Section, shall be subtracted from such taxable income or loss.

(c) If the Gross Asset Value of any asset is adjusted pursuant to Subsections 3.7(b) or 3.7(c), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits and Losses.

(d) Gain or loss resulting from any disposition of assets with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the assets disposed of (as adjusted under this Operating Agreement), notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value.

(e) In lieu of the depreciation, amortization, and other cost-recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Accounting Period as defined hereinafter.

(f) To the extent an adjustment to the adjusted tax basis of any asset pursuant to Code section 734(b) or Code section 743(b) is required to be taken into account in determining Capital Accounts, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits and Losses.

The Company's distributive share of any Profits and Losses (as defined herein) from any partnership (including any limited liability company or other entity treated as a partnership for tax purposes) in which it holds an interest, adjusted to avoid taking into account any items otherwise reflected in the Company's Profits and Losses, shall be included in the Company's Profits and Losses.

"Regulations" means the final and temporary regulations of the U.S. Department of the Treasury promulgated under the Code.

"Restricted Period" means, with respect to a Management Member, the period commencing on the date on which Profits Interests were initially issued to such Management Member and ending on the earlier of (a) the date on which a Winding Up Event is consummated or (b) the second anniversary of the date of Termination.

"Restructuring" means the transactions contemplated by that certain Master Restructuring Agreement dated as of April 3, 2013 by and among the Company, Holdings GP and the other parties set forth on the signature pages thereto.

"Securities Act" means the Securities Act of 1933, as amended.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company or other entity (whether incorporated or unincorporated) of which more than 50% of the voting power of the voting equity securities or equity interest is owned, directly or indirectly, by such Person.

"Supply Agreement" means that certain Supply and Distribution Agreement dated December 23, 2011 between Covis Pharma S.à. r.l., a company organized under the laws of Luxembourg, and Covis Pharmaceuticals, Inc., a Delaware corporation, as amended.

"Tax Distribution Amount" has the meaning ascribed to it in the Holdings LLC Agreement.

"Termination", "Terminated" or "Terminates" shall mean that a Management Member's employment with or services to any of Holdings or any of its Subsidiaries shall have ceased for any reason whatsoever (including by reason of death, permanent disability or adjudicated incompetency).

"Termination Payment" has the meaning given such term in the Supply Agreement.

"Transaction" means any dividend or other distribution (regardless of form), reorganization, merger, consolidation, combination, repurchase, recapitalization, liquidation, dissolution, or sale, transfer, exchange or other disposition of all or substantially all of the assets of Holdings, or sale, transfer, exchange or other disposition of interests in Holdings, or other similar corporate transaction or event, including any change in any applicable Laws or accounting principles, which the Board of Managers deems to constitute a Transaction for purposes of this Operating Agreement.

"Transfer" means (a) as a noun, any conveyance or other transfer, alienation, lease, mortgage, pledge, encumbrance or hypothecation, and (b) as a verb, the act of making any voluntary or involuntary Transfer.

"Unvested Profits Interest" means a Profits Interest that is unvested at the time of measurement pursuant to the terms of this Operating Agreement and any applicable Award Agreement.

"Vested Percentage" has the meaning ascribed to such term in the Holdings LLC Agreement.

"Vested Profits Interest" means a Profits Interest that is vested at the time of measurement pursuant to the terms of this Operating Agreement and any applicable Award Agreement.

"Winding Up Event" has the meaning ascribed to such term in the Holdings LLC Agreement.

**Other Defined Terms**

The following terms are defined on the following pages:


Agent ..... 13
Award Agreement ..... 4
Board of Managers ..... 13
Call ..... 23
Call Notice ..... 23
Capital Interest ..... 4
Certificate of Formation ..... 1
Class B Winding Up Amount ..... 11
Company ..... 1
Competitive Activity ..... 19
Confidential Information ..... 19
Covered Person ..... 18
Dissolution Event ..... 25
Effective Date ..... 1
Equity Profit Amount ..... 11
Forfeited Profits Interests ..... 25
Forfeiture Notice ..... 24
Grant Value ..... 5
Holdings ..... 1
Holdings GP ..... 1
Holdings Manager ..... 13
Holdings Vote Matter ..... 15
Losses ..... 12
Management Equity Pool Interests ..... 4
Management Member ..... 1
Manager ..... 13
Members ..... 1
Notice Date ..... 23
Operating Agreement ..... 1
Option Closing ..... 23
Original Equity Pool ..... 4
Other Agreement ..... 17
Parties ..... 1
Party ..... 1
Permitted Transferee ..... 22
PI Manager ..... 13
PI Unit Price ..... 10
Pro Rata Portion ..... 12
Proceeds ..... 9
Profits ..... 12
Profits Interests ..... 4
Prohibited Activity ..... 24
Prohibitions ..... 24
Qualified Person ..... 14
Repurchased Profits Interests ..... 23
Restructuring Agreement ..... 1
Scheduled Closing Date ..... 23
Subject Profits Interests ..... 23
Termination Payment ..... 10
Winding Up Value ..... 5

**EXHIBIT B**

**Joinder to Operating Agreement**

The undersigned is executing and delivering this Joinder Agreement pursuant to the Amended and Restated Limited Liability Company Agreement of Covis Management Investors US LLC, a Delaware limited liability company, as amended, supplemented or otherwise modified in accordance with the terms thereof (the "Operating Agreement"). Capitalized terms used but not defined in this Joinder Agreement shall have the respective meanings ascribed to them in the Operating Agreement.

By executing and delivering this Joinder Agreement to the Operating Agreement, the undersigned hereby agrees to be admitted as a member of the Company and to become a party to, to be bound by, and to comply with the provisions of the Operating Agreement in the same manner as if the undersigned were an original signatory to such agreement as a Member. In connection therewith and without limiting the foregoing, effective as of the date hereof the undersigned hereby makes the representations and warranties contained in the Operating Agreement, effective as of the date hereof.

Accordingly, the undersigned has executed and delivered this Joinder Agreement as of the __ day of ____________, 2___.

______________________________
Signature of Member

______________________________
Print Name of Member

______________________________
______________________________
______________________________
Address of Member

Acknowledged and accepted:

COVIS MANAGEMENT INVESTORS US LLC

By:____________________________
Name:
Title:

# EXHIBIT C

## Spousal Consent

In consideration of the execution of that certain Amended and Restated Limited Liability Company Agreement of Covis Management Investors US LLC (the "Company"), as amended, supplemented or otherwise modified in accordance with the terms thereof (the "Operating Agreement"), by and among [____________] (the "Member") and the other parties thereto, I, [_______________], the spouse of the Member, do hereby confirm that:

(a) I have read and approve of the provisions of the Operating Agreement [and the Joinder Agreement];

(b) I do join with my spouse in executing the [Operating Agreement / Joinder Agreement];

(c) I do agree to be bound by and accept the provisions of the Operating Agreement [and the Joinder Agreement]; and

(d) I do agree that any interests I may have in the membership interests of the Company and any other securities contemplated by the Operating Agreement, whether the interest may be community property or otherwise, shall be similarly bound by the Operating Agreement.

I am aware that the legal, financial and related matters contained in the Operating Agreement [and the Joinder Agreement] are complex and that I am free to seek independent professional guidance or counsel with respect to this spousal consent. I have either sought such guidance or counsel or determined after reviewing the Operating Agreement [and the Joinder Agreement] carefully to waive such right.

Acknowledged and agreed this _____ day of __________, 20___.

______________________________

[Name]

**SCHEDULE A**

**SCHEDULE OF MEMBERS**

**SCHEDULE 4.1(B)**

*The information set forth in Schedule 4.1(b) is for illustrative purposes only and the parties hereto understand and agree that the sole purpose of this exhibit is to provide a hypothetical example of the mathematical mechanics of certain potential liquidation scenarios. Nothing set forth in this Schedule 4.1(b) shall operate or be construed to operate as a guarantee, promise or commitment to any Member of future returns or the performance of this investment. All references to "Value" or "Valuation" in Schedule 4.1(b) refer to the Fair Market Value of Covis US Holdings LLC. In addition, the calculation set forth in Schedule 4.1(b) assumes for the sake of simplicity that no fees, expenses or other debts, liabilities, costs or obligations exist at the closing of the transaction giving rise to the distribution illustrated therein.*