## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

TONYA BROWN, JOHN ELSTAD, ALBERT GOEKEN,
ELIZABETH HOMAN, AND JEFFERY SAMPERE,

        PLAINTIFFS,

v.

CERBERUS CAPITAL MANAGEMENT, L.P.,
CERBERUS COVIS LLC, COVIS HOLDINGS, L.P.,
COVIS MANAGEMENT INVESTORS LLC, COVIS US
HOLDINGS, LLC, COVIS MANAGEMENT INVESTORS
US LLC, COVIS PHARMACEUTICALS, INC.,
ALEXANDER BENJAMIN, MICHAEL KELLY, AND
ETHAN KLEMPERER,

        DEFENDANTS.

__ CIV. ____

*ECF CASE*

***COMPLAINT***

JURY TRIAL DEMANDED

Plaintiffs Tonya Brown, John Elstad, Albert Goeken, Elizabeth Homan, and Jeffery Sampere (collectively, "Plaintiffs"), by their attorney, as and for their complaint against Cerberus Capital Management, L.P. ("Cerberus Capital Management"), Cerberus Covis LLC ("Cerberus Covis") (together, with Cerberus Capital Management, "Cerberus"), Covis Holdings, L.P. ("Covis Holdings"), Covis US Holdings, LLC ("Covis US Holdings"), Covis Management Investors LLC ("MIP LLC"), Covis Management Investors US LLC ("MIP US"), Covis Pharmaceuticals, Inc. ("CPI") (collectively, "Covis" or the "Covis Enterprise"), Alexander Benjamin ("Benjamin"), Michael Kelly ("Kelly"), and Ethan Klemperer ("Klemperer") (collectively, "Defendants"), respectfully allege as follows, on knowledge as to themselves and their own acts and on information and belief as to all other matters:

### NATURE OF ACTION

1.       This is an action for, *inter alia*, breach of contract, fraud, securities fraud, unjust enrichment, and promissory estoppel.

2.       As detailed below, Covis hired Plaintiffs in late 2011 and early 2012. Plaintiffs accepted below market salaries because Covis promised them a significant percentage of the profits realized by the Covis Enterprise. Yet, Covis kept Plaintiffs in the dark regarding the corporate structure, manipulated that structure to gut the value of Plaintiffs' interests, and terminated Plaintiffs just before the majority of their interests were about to vest. Then, when Covis repurchased Plaintiffs' interests, Covis claimed that the Covis Enterprise was worth $470 million. Just eleven days later, Covis sold approximately 85% of its assets for $1.2 *billion*. Covis used its acts of bad faith and deceit to justify paying Plaintiffs less than $300,000, when it owed them more than $30 million.

3.       When Plaintiffs joined Covis, a pharmaceutical start-up, it was a short-term commitment: Covis and Cerberus said that they hoped to sell Covis's assets to a large healthcare company within three or four years.

4.       In return for low salaries, Covis granted Plaintiffs "profits interests," *i.e.,* equity compensation constituting interests in the future profits and appreciation of the assets of the Covis Enterprise ("Profits Interests"). A profits interest is essentially a share of the increase in the value of a business over a stated period of time.

5.       Plaintiffs received Profits Interests pursuant to two Award Agreements: the 2012 Award Agreement, which granted them interests in MIP LLC, which owned Profits Interests in Covis Holdings ("MIP LLC Profits Interests"); and the 2013 Award

Agreement, which granted them interests in MIP US, which owned Profits Interests in Covis US Holdings ("MIP US Profits Interests").

6.      Covis was a complex network of limited liability companies and partnerships owned by Cerberus. To understand the corporate structure and what their Profits Interests would actually be worth, Plaintiffs repeatedly requested copies of key corporate documents. Covis and Cerberus refused, and made numerous materially false representations and omissions to mislead Plaintiffs into believing that their Profits Interests had significant value.

7.      Most importantly, when Covis issued Plaintiffs' MIP US Profits Interests in September 2013, Covis represented orally and in writing to Plaintiffs that: (a) their Profits Interests were equal to 3.5% of the fully diluted equity of the Covis Enterprise; (b) the fair market value of Plaintiffs' MIP US Profits Interests would be "grossed-up" by 31% to cover any taxes; and (c) Cerberus and the various Covis entities would execute various corporate documents in the near future to memorialize these representations.

8.      Plaintiffs reasonably relied upon these promises. Plaintiffs worked hard for Covis, and the venture was a huge success.

9.      Meanwhile, Covis and Cerberus plotted schemes of bad faith and deceit to keep the profits for themselves and deprive Plaintiffs of nearly everything they had earned.

10.     First, when Covis anticipated an acquisition, it terminated Plaintiffs in bad faith to prevent their Profits Interests from fully vesting. Plaintiffs' terminations were arbitrary, lacking any business justification and prefaced with misrepresentations regarding Covis's and Cerberus's immediate intentions.

11.     Second, when Covis and Cerberus exercised the call option on Plaintiffs' MIP US Profits Interests (the "Repurchase"), they reneged on their oral and written promises and representations regarding the formula that would be used to calculate the fair market value of Plaintiffs' Profits Interests. Covis and Cerberus refused to pay Plaintiffs' their share of 3.5% of the fully diluted equity of the Covis Enterprise, and refused to apply a 31% tax gross-up. Instead, Covis and Cerberus purported to pay them 10% of the gross profits on product sales, a formula that had never been disclosed to Plaintiffs and which was entirely at odds with Covis's and Cerberus' prior representations.

12.     Third, to determine the fair market value of Plaintiffs' MIP US Profits Interests, Covis and Cerberus used a knowingly false valuation that valued the Covis Enterprise at $470 million.

13.     Covis and Cerberus rushed to close the Repurchase on February 26, 2015, and forced Plaintiffs to forfeit their MIP US Profits Interests at values premised on the $470 million valuation.

14.     Just eleven days after the forced closing of the Repurchase, Covis sold the commercial rights to eighteen of its twenty-one pharmaceuticals to Concordia Healthcare, Inc. ("Concordia") for $1.2 billion (the "Concordia Acquisition").

15.     In total, Covis and Cerberus had realized more than $1 billion in profits on the Covis Enterprise.

16.     Per the Award Agreements and Covis's and Cerberus's promises and representations, Plaintiffs were owed some $30 million of that $1 billion. Instead, Covis and Cerberus paid Plaintiffs less than $300,000, wrongfully keeping the rest for themselves.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1367, and Section 27 of the Securities Exchange Act of 1934, as amended (the "Act"), 15 U.S.C. § 78aa.

18.    This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

19.    Venue is proper in this Court pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391. The agreements entered into between Plaintiffs and Covis also contain forum selection clauses selecting courts in the State of New York.

## THE PARTIES

20.    Plaintiff Tonya Brown ("Brown") is an individual residing in Raleigh, North Carolina. She worked for CPI as the Director, Contract Operations from September 2011 to June 24, 2014.

21.    Plaintiff John Elstad ("Elstad") is an individual residing in Lakeville, Minnesota. He worked for CPI as Vice President, Retail Development from September 2011 to June 30, 2014.

22.    Plaintiff Albert Goeken ("Goeken") is an individual residing in Cary, North Carolina. He worked for CPI as Vice President, Trade Operations from September 2011 to August 14, 2014.

23.    Plaintiff Elizabeth Homan ("Homan") is an individual residing in Allendale, New Jersey. She worked for CPI as Vice President, National Accounts from September 2011 to December 1, 2014.

24.     Plaintiff Jeff Sampere ("Sampere") is an individual residing in Raleigh, North Carolina. He worked for CPI as the Vice President of Marketing from January 2012 to December 15, 2014.

25.     Upon information and belief, Defendant Cerberus Capital Management is a Delaware limited partnership with its principal place of business in New York, New York.

26.     Upon information and belief, Defendant Cerberus Covis is a Delaware limited partnership with its principal place of business in New York, New York.

27.     The Cerberus companies, founded in 1992, comprise one of the largest group of funds specializing in private equity and corporate restructuring. Cerberus has approximately $25 billion in assets under management.

28.     Defendant CPI is a North Carolina corporation, with its principal place of business in Cary, North Carolina. CPI is a specialty pharmaceutical distributor in the cardiovascular, central nervous system and acute care markets.

29.     Upon information and belief, Defendant Covis Holdings is a limited partnership registered in the Cayman Islands.

30.     Defendant MIP US is a limited liability company organized pursuant to the Delaware Limited Liability Company Act.

31.     Defendant Covis US Holdings is a limited liability company organized pursuant to the Delaware Limited Liability Company Act.

32.     Defendant MIP US is a limited liability company organized pursuant to the Delaware Limited Liability Company Act.

33.     Upon information and belief, Defendant Alexander Benjamin is an individual residing in New York, New York. He was and continues to be the Managing Director and Associate General Counsel of Cerberus Capital Management and sat on the Board of Managers of MIP US.

34.     Upon information and belief, Defendant Michael Kelly is an individual residing in Philadelphia, Pennsylvania. He has been the CEO and President of CPI since January 2014.

35.     Upon information and belief, Defendant Ethan Klemperer is an individual residing in New York, New York. He was and continues to be Senior Operating Executive, Head of Strategic Initiatives, Diligence and Resource Deployment, Cerberus Operations and Advisory Company, LLC at Cerberus Capital Management, and sat on the Board of Managers of MIP US.

*FACTUAL BACKGROUND*

36.     Upon information and belief, Defendants knowingly and intentionally agreed and conspired among themselves to harm Plaintiffs and to commit the actions alleged herein. Upon information and belief, each Defendant furthered the conspiracy by cooperation with the other Defendants.

I.     COVIS IS A PROMISING PHARMACEUTICALS START-UP

37.     In 2010, William Collins and Ronald Lickteig founded Covis. Jack Davis joined them shortly thereafter.

38.     Collins, Lickteig, and Davis (the "Founders") had a straightforward concept. As Mr. Collins said in an interview, "We will acquire the rights to branded drugs that have gone off-patent, but remain critical therapies in acute-care markets." By rebranding and developing new marketing strategies for neglected pharmaceuticals,

Covis would increase their profitability and exposure, making them attractive acquisition targets for large healthcare companies.

39.     The project began when the Founders approached GlaxoSmithKline ("GSK"), where Mr. Collins had worked for many years, to acquire the commercial rights to distribute five products in the United States.

40.     Originally, the Covis Enterprise was divided into four parts. The central entity was Covis Holdings. Covis Holdings owned both Covis Pharma S.à.r.l., a Swiss entity in Zug, Switzerland, and CPI, a North Carolina corporation in Cary, North Carolina.

41.     Covis Pharma S.à.r.l. owned all of the commercial rights to the pharmaceuticals because of the benefits of the Swiss corporate tax code. CPI, on the other hand, distributed the products in the United States.

42.     Meanwhile, a fourth entity, MIP LLC, owned the Profits Interests of the entire Covis Enterprise. That is to say, MIP LLC owned all of the equity in the Covis Enterprise less any debt and class A preferred equity.

43.     The Founders assumed key positions across the Covis Enterprise.

44.     Mr. Collins served as the CEO of CPI. During his tenure, Mr. Collins also sat on the Board of Directors of MIP LLC and CPI.

45.     Mr. Davis served as the CEO of Covis Pharma S.à.r.l.

46.     Mr. Lickteig served as the Vice President and General Manager of CPI.

## II.   CERBERUS AND COVIS ARE FULLY-INTEGRATED ENTITIES

47.     While negotiating with GSK, the Founders approached Cerberus to secure financing for the Covis Enterprise. Cerberus agreed and the financing was finalized in late 2011.

48.     As a result of its substantial investment, Cerberus effectively owned and controlled the Covis Enterprise. For example:

    a.   Cerberus, as the general partner, maintained control over the Covis Enterprise;

    b.   Cerberus representatives and employees were on-site at Covis in both Switzerland and North Carolina, overseeing and managing the day-to-day operations;

    c.   Cerberus representatives were installed as the managers and directors of the various Covis entities; and

    d.   numerous Cerberus appointees sat on the Covis Holdings Board of Managers.

49.     Similarly, the MIP LLC Board of Managers originally had three members, including Mr. Collins and a Cerberus appointee. At later times, the MIP LLC Board of Managers included Defendants Benjamin and Klemperer, both Cerberus executives.

50.     Thus, once the financing and corporate structure were in place, Covis and Cerberus were fully integrated entities, with no arm's length relationship, as exemplified by the creation of Cerberus Covis, which was the holding company for Cerberus's investment.

### III.   COVIS RECRUITS PLAINTIFFS, PROMISING TREMENDOUS RETURNS IN EXCHANGE FOR THEIR EXPERTISE AND RISK

51.     Prior to founding Covis, Mr. Collins worked at GSK, where he became acquainted with Plaintiffs.

52.     When Covis was approaching a deal with both GSK and Cerberus, Mr. Collins sought out his former colleagues to manage CPI.

53.     Mr. Collins recruited Plaintiffs for their decades of experience in pharmaceutical sales. Their contacts were invaluable to a start-up whose profitability relied almost exclusively upon distribution and sales.

54.     Because it was a start-up, Covis offered Plaintiffs salaries that were far below the market rate, approximately two-thirds of what they had earned in their previous positions.

55.     Plaintiffs agreed to these terms and conditions only because Covis promised them Profits Interests. The Founders routinely represented to Plaintiffs that they would receive anywhere from "six figures" (for Ms. Brown, who had the least equity) to more than $5 million (for Mr. Goeken who had the most) for their Profits Interests if the Covis Enterprise ended up being worth more than $1 billion, which they fully expected.

56.     The Founders and Cerberus executives repeatedly represented to Plaintiffs that they anticipated Covis and/or its assets would be acquired in 2014 or 2015.

57.     Because of Cerberus's long history of successful private equity investments, Plaintiffs were reassured that the venture had genuine potential and was worth the risk.

58.     Plaintiff Goeken was the first to join. He had worked with Mr. Collins in the past, and was enthusiastic about the potentially lucrative Covis start-up, which would likely be his last venture before retirement.

59.     Plaintiff Elstad left GSK, where he had worked for twenty-five years, to join Covis. When recruiting Mr. Elstad, the Founders represented that Covis or its assets would likely be sold within three to four years.

60.     Plaintiff Homan left her consulting practice to join Covis. As a consultant, Ms. Homan earned nearly double her salary at Covis. She believed the promise of profits interests, which she hoped would finance her children's college educations, justified the risk.

61.     Plaintiff Brown left her prior position because Mr. Collins and Mr. Davis promised her that her Profits Interest would be worth at least "six figures." Like her colleagues, she understood that the Covis venture had significant risks, but those were outweighed by the potential rewards, which she would use to pay for the education of her adolescent son, who has special needs.

62.     Plaintiffs Brown, Elstad, Goeken, and Homan joined CPI in the late summer of 2011.

63.     Finally, Plaintiff Sampere left his position the Senior Product Manager at Smith & Nephew. Like the other Plaintiffs, Mr. Sampere perceived Covis as a lucrative opportunity that would reward him for his decades in the pharmaceuticals industry.

64.     Plaintiff Sampere joined CPI in January 2012.

65.     Plaintiffs were five of the eight members of the CPI management team ("CPI Management").

66.     Plaintiffs worked without any salary for their first four months of employment, while the acquisition and financing agreements were finalized.

67.     Similarly, at the outset, Plaintiffs used their personal business equipment and worked from home. When office space became available, Plaintiffs worked with minimal office furniture, amenities, or supplies.

68.     Nevertheless, Plaintiffs used their experience and expertise to quickly turn the Covis Enterprise into a startling success.

**IV.     COVIS ISSUES THE 2012 AWARD AGREEMENTS TO PLAINTIFFS, WHICH COVIS CLAIMS WILL BE WORTH MILLIONS**

69.     On or about September 30, 2012, Covis distributed Award Agreements to Plaintiffs (the "2012 Award Agreements"). Plaintiffs executed the 2012 Award Agreements shortly thereafter.

70.     Plaintiffs had no role in the drafting of the 2012 Award Agreements, nor were they afforded any opportunity to negotiate the terms.

71.     Pursuant to the 2012 Award Agreements, Covis granted Plaintiffs MIP LLC Profits Interests, which were equal to a percentage of the fully diluted equity of Covis Holdings. Covis did not disclose the Covis Holdings Operating Agreement to Plaintiffs.

72.     MIP LLC was a manager-managed limited liability company. By the express terms of the MIP LLC Operating Agreement, Plaintiffs were entirely passive members. Plaintiffs had no authority to select the managers, had no authority to participate in the management or control of MIP LLC, and had no authority to act on its behalf or to bind it in any manner.

73.     Ms. Brown was granted 10,000 MIP LLC Profits Interests, equal to 0.10% of the fully diluted equity of Covis Holdings; Mr. Elstad, Ms. Homan, and Mr. Sampere were each granted 25,000, equal to 0.25%; and Mr. Goeken was granted 40,000 equal to 0.40%.

74.     Half of Plaintiffs MIP LLC Profits Interests were time-based vesting interests and the other half were performance-based vesting interests. The time-based

vesting interests vested in annual installments over four years, with 15% vesting on January 1, 2013, 20% vesting on January 1, 2014, 30% vesting on January 2, 2015, and the remaining 35% vesting on January 1, 2016.

75.    Upon the consummation of a "Winding Up Event," which included the sale or acquisition of substantially all Covis's assets, all of the time-based vesting interests would immediately vest if the grantee were still employed by Covis.

76.    Though the 2012 Award Agreements stated that Plaintiffs would ultimately receive the fair market value of their MIP LLC Profits Interests, it provided no further detail.

77.    Over the course of 2012 and 2013, Plaintiffs repeatedly requested documentation confirming the formula that would be used to calculate the fair market value of their MIP LLC Profits Interests. Covis did not provide any documentation.

78.    Nevertheless, consistent with the Founders' prior representations that a percentage of the profits Covis Enterprise had been set-aside for CPI Management, Mr. Collins repeatedly told Plaintiffs that if the Covis Enterprise sold for more than $1 billion, they would receive millions for their MIP LLC Profits Interests.

## V.    COVIS RESTRUCTURES TO REALIZE CORPORATE TAX BENEFITS AND ISSUES THE 2013 AWARD AGREEMENTS TO PLAINTIFFS

79.    In April 2013, Covis restructured to formally separate the Swiss operations from the American operations (the "Restructuring"). Covis and Cerberus represented the Restructuring was to help the Covis Enterprise maximize the benefits of the low corporate tax rates under Swiss law.

80.    Over the course of 2013, Covis kept Plaintiffs in the dark regarding the details of the Restructuring. Mr. Collins and Dean Mitchell, the Executive Chairman of

the Covis Pharma Holdings S.à.r.l. Board, repeatedly told Plaintiffs not worry about the effect of the Restructuring on their Profits Interests. They assured Plaintiffs that Cerberus would take care of them and that the Restructuring would significant positive effects on the value of their Profits Interests.

81.     Though Plaintiffs repeatedly requested copies of the Restructuring agreements to confirm these representations, Covis refused to provide them.

82.     Then, in October 2013, Covis distributed a second award agreement to Plaintiffs (the "2013 Award Agreements").

83.     Plaintiffs had no role in the drafting of the 2013 Award Agreements, nor were they afforded any opportunity to negotiate the terms.

84.     The 2013 Award Agreements granted Plaintiffs MIP US Profits Interests. MIP US was a manager-managed limited liability company that Covis and Cerberus had created in the Restructuring. The MIP US Board of Managers consisted of three people, including Defendants Benjamin and Klemperer of Cerberus.

85.     By the express terms of the MIP US Operating Agreement, Plaintiffs were entirely passive members. Plaintiffs had no authority to select the managers, had no authority to participate in the management or control of MIP US, and had no authority to act on its behalf or to bind it in any manner.

86.     Per the 2013 Award Agreements, MIP US owned the profits of Covis US Holdings, another new entity that had been created in the Restructuring.

87.     Half of the MIP US membership interests were time-based vesting interests and the other half were performance-based vesting interests. Ms. Brown was granted 78,289 MIP US Profits Interests, equal to 0.49% of the fully diluted equity of

Covis US Holdings; Mr. Elstad and Mr. Sampere were each granted 195,724, equal to 1.22%; and Mr. Goeken was granted 313,158 equal to 1.96%.

88.     The time-based vesting interests vested in annual installments over three years, with 15% vested upon issuance, 20% vesting on January 1, 2014, 30% vesting on January 2, 2015, and the remaining 35% vesting on January 1, 2016.

89.     The 2013 Award Agreements provided that, upon the consummation of a "Winding Up Event," which included the sale or acquisition of substantially all Covis's assets, all of the grantee's time-based vesting interests would immediately vest provided that the grantee was still employed by Covis at the time.

90.     In a section entitled, "Forfeiture," the 2013 Award Agreements provided that if the grantee were terminated without cause, MIP US "in its sole discretion, shall have the right to either (1) permit Participant to retain Participant's Vested Profits Interests as of the Termination Date or (2) require Participant to sell all of the Vested Profits Interests held as of the Termination date to the Company, which right shall be exercisable by delivery of a written notice to the Participant. The purchase price for the Vested Profits Interests to be purchased by the Company pursuant to its Call Right shall be the Fair Market Value of such interests as of the Termination Date as determined in accordance with the [MIP US Operating Agreement]."

91.     Covis's call option stood in stark contrast to the lack of put option for Plaintiffs.

92.     The MIP US Operating Agreement provided that the fair market value of Plaintiffs' MIP US Profits Interests would be "determined in good faith by the Board of Managers, taking into account all relevant factors, including, without limitation the most

recent valuation, prior to such determination, of the Company and/or its equity interests, provided that the Board of Managers shall provide written notice to the Management Members of such determination."

93.     The 2013 Award Agreements were deliberately obscure. Critically, they did not state what assets Covis US Holdings owned, which was material because Covis US Holdings was a new entity. That is to say, the 2013 Award Agreements, drafted entirely by Cerberus and Covis, omitted the most important piece of information: the formula Covis and Cerberus would use to calculate the fair market value of Plaintiffs' MIP US Profits Interests as they related to the value of the Covis Enterprise.

94.     Because of this glaring and disturbing omission, Plaintiffs refused to execute their 2013 Award Agreements until they received further clarification.

## VI.   THE PRESENTATION CLARIFIES HOW PLAINTIFFS' PROFITS INTERESTS WOULD BE VALUED

95.     To convince Plaintiffs to sign the 2013 Award Agreements and remain with CPI, Covis made a presentation to Plaintiffs on October 7, 2013, to explain how it would value their MIP US Profits Interests (the "Presentation").

96.     Defendant Klemperer, a Cerberus executive who sat on the MIP US Board of Managers, conducted the web-based Presentation from Cerberus's offices in New York. Defendant Klemperer spoke on behalf of both Covis and Cerberus.

97.     Plaintiffs Brown, Goeken, and Sampere viewed the Presentation in a conference room at CPI's headquarters in Cary, North Carolina. Plaintiff Homan viewed the Presentation on-line from her home in New Jersey. Plaintiff Elstad was in transit and was unable to view the Presentation.

98.     During the Presentation, Defendant Klemperer explained how the Restructuring had altered Covis's corporate structure. Covis Holdings had previously owned both Covis Pharma S.à.r.l. and CPI. It now owned only Covis Pharma S.à.r.l. A new holding company, Covis US Holdings, now owned CPI. And the newly formed MIP US owned the profits interests in Covis US Holdings. Nevertheless, Cerberus continued to own the entire Covis Enterprise, *i.e.*, both Covis Holdings and Covis US Holdings.

99.     According to Defendant Klemperer, Covis Pharma S.à.r.l. would continue to own the commercial rights to the pharmaceuticals. For tax reasons, Covis Pharma S.à.r.l. would also be allocated 90% of the profits on sales, with the remaining 10% going to CPI.

100.     Defendant Klemperer was adamant and unwavering in assuring Plaintiffs that these allocations were for tax purposes only, and that Plaintiffs would benefit from the Restructuring.

101.     Defendant Klemperer expressly stated that the Restructuring would have no negative effect on the value of Plaintiffs' Profits Interests, which always had and always would relate to the value of the entire Covis Enterprise. Defendant Klemperer further stated that the 90/10 division of profits on sales was irrelevant to the fair market value of Plaintiffs' MIP US Profits Interests.

102.     During the Presentation, Defendant Klemperer represented that 7% of the income and equity of Covis Pharma S.à.r.l. would be allocated to CPI to compensate CPI Management for their MIP US Profits Interests. Defendant Klemperer also represented that any computation of the fair market value of Plaintiffs' MIP US Profits Interests would include a 31% tax gross-up, so that Plaintiffs would be "made whole" and reap

their share of the tax benefits that the Covis Enterprise would realize by cloistering its valuable assets in Switzerland.

103.    Defendant Klemperer represented that Covis had not yet, but would in the near future, execute a Supply and Distribution Agreement between Covis Pharma S.à.r.l. and CPI, entities both owned and controlled by Cerberus (the "Supply Agreement") that would memorialize these representations.

104.    Plaintiffs requested copies of the Presentation materials. Covis refused. During the course of Plaintiffs' employment, Covis and Cerberus also refused to give Plaintiffs a copy of the executed Supply Agreement.

## VII.    THE CPI EQUITY SCHEDULES AND MR. COLLINS UNAMBIGUOUSLY REPRESENT HOW COVIS WOULD CALCULATE THE FAIR MARKET VALUE OF PLAINTIFFS' PROFITS INTERESTS

105.    Immediately after the Presentation, Covis distributed personalized equity schedules (the "CPI Equity Schedules"), which provided Plaintiffs with a basic, though incomplete, snapshot of their Award Agreements.

106.    The CPI Equity Schedules represented that Plaintiffs' Profits Interests related to a certain percentage of "CPI Management Interests." For example, Ms. Brown's CPI Equity Schedule represented that her MIP LLC Profits Interests equaled 6.6% of the CPI Management Interests. Similarly, her MIP US Profits Interests also equaled 6.6% of the CPI Management Interests. For Mr. Elstad, Ms. Homan, and Mr. Sampere, they had each been granted Profits Interests equal to 16.4% of the CPI Management Interests. Finally, Mr. Goeken's Profits Interests equaled 26.3% of the CPI Management Interests.

107.    The CPI Equity Schedule did not state what "CPI Management Interests" meant. The phrase was in any of Plaintiffs' Award Agreements, nor was it defined

anywhere else. Plaintiffs understood the phrase to reference the 7% of equity and income of the Covis Enterprise that would be owned by CPI per the terms of the soon-to-be-executed Supply Agreement, which Defendant Klemperer had discussed during the Presentation.

108.    Because of their lingering confusion, Plaintiffs sought out Mr. Collins, a Founder and Covis's CEO, for clarification. On at least three separate occasions, Mr. Collins clarified Plaintiffs' understanding as to the meaning of CPI Management Interests. Mr. Collins spoke both in his capacity as CEO of CPI, and as a general representative of the Covis Enterprise.

109.    First, immediately following the Presentation, Mr. Sampere invited Mr. Collins into his office to discuss his CPI Equity Schedule.

110.    Mr. Collins explained that Mr. Sampere's MIP US Profits Interests equaled 16.4% of the CPI Management Interests and that the CPI Management Interests equaled 3.5% of the fully diluted equity of the Covis Enterprise.

111.    For clarity, Mr. Collins gave Mr. Sampere the following example: Assume that the Covis Enterprise is worth $650 million. With $150 million in debt and $200 million owed to the class A preferred shareholders, the remaining $300 million in profits to be distributed among Profits Interests holders. Thus, if Mr. Sampere's MIP US Profits Interests were fully vested, he would receive 16.4% of 3.5% of $300 million.

112.    To illustrate his point, Mr. Collins wrote the following equation on Mr. Sampere's CPI Equity Schedule: 16.4% x 3.5% x $300 M = $1,722,000. A true and correct copy of Mr. Sampere's CPI Equity Schedule with Mr. Collins's handwritten representations is attached hereto as Exhibit A.

113.    Mr. Collins also confirmed and represented that Mr. Sampere's $1,722,000 would also be increased by 31% for the tax gross-up.

114.    Later that day, Mr. Collins made an identical representation to Mr. Goeken. Mr. Collins said that if Mr. Goeken's MIP US Profits Interests were fully vested, and if the Company sold for $600 million in profit, Mr. Goeken would receive "well over $5 million." Mr. Collins orally represented the following equation: 26.3% x 3.5% x $600 million = $5,500,000.

115.    The next day, Mr. Collins had a telephone conversation with Ms. Homan and made the same representations regarding her MIP US Profits Interests. Mr. Collins reaffirmed Defendant Klemperer's representation that the Supply Agreement would guarantee Covis US Holdings and CPI 7% of the Covis Enterprise's equity and income. He further confirmed that the CPI Management Interests on the CPI Equity Schedule equaled 3.5% of the Covis Enterprise's equity and income, and that the fair market value of Plaintiffs' vested MIP US Profits Interests would be grossed-up by 31%.

116.    Ms. Brown and Mr. Elstad did not have the opportunity to discuss their CPI Equity Schedules with Mr. Collins personally, but they were aware of his representations.

117.    Shortly after his conversation with Mr. Collins, Mr. Goeken spoke with Mr. Elstad. Mr. Goeken explained the content of the Presentation and conveyed Mr. Collins's clarifications regarding the CPI Equity Schedules and the CPI Management Interests.

118.    In the days following the Presentation, both Mr. Sampere and Mr. Goeken communicated Mr. Collins's representations regarding the CPI Equity Schedules and the CPI Management Interests to Ms. Brown.

119.    In justifiable and reasonable reliance upon Defendant Klemperer's representations, the CPI Equity Schedules, and Mr. Collins's unambiguous representations, which filled in the remaining gaps regarding the value of their Profits Interests, Plaintiffs executed the 2013 Award Agreements in November 2013. Based upon those same representations, Plaintiffs agreed to continue working for CPI at below-market salaries.

120.    As discussed below, Defendant Klemperer's representations, the representations in the CPI Equity Schedules, and Mr. Collins's representations – all of which were made on behalf of and for the benefit of Covis and Cerberus – were knowingly and/or recklessly false. Then Covis and Cerberus exploited their material misrepresentations and omissions to create a windfall for themselves at Plaintiffs' expense.

## VIII.   COVIS ARBITRARILY TERMINATES PLAINTIFFS WHILE ANTICIPATING AN ACQUISITION

121.    In December 2013, Cerberus ousted Mr. Collins and inserted Defendant Michael Kelly as President and CEO of CPI in January 2014.

122.    Mr. Collins's termination occurred just as Covis entered the timeframe in which it had always anticipated being acquired.

123.    When Defendant Kelly took over, the CPI work environment immediately changed for the worse.

124.    Though Mr. Collins was demanding on everyone, he created a collegial and there was a great sense of camaraderie as everyone worked toward a mutually beneficial goal.

125.    Defendant Kelly's hiring changed all of that, as it quickly became clear that Covis and Cerberus intended to oust Plaintiffs as well.

126.    The first indications of Covis's bad faith strategy emerged in the spring of 2014, when Defendant Kelly hired Al Tenuto as Vice President, Market Access.

127.    At the time, Covis was experiencing tremendous success. A Moody's rating issued in April 2014 revised Covis's rating outlook to positive from stable. Moody's perceived substantial upside due to the anticipated re-launch of certain branded products. Moody's also referenced Covis's "very high" operating margins and net profits margins.

128.    Nevertheless, Mr. Tenuto's hiring coincided with a number of events that revealed Covis's intention to manufacture pre-textual reasons for terminating Plaintiffs.

129.    For example, the newly hired members Covis executives and management members blamed Plaintiffs for their own pricing errors to fabricate a basis for their terminations.

130.    Then, Mr. Tenuto conducted an audit of Covis's operations, which found operational inefficiencies where none existed. These bad faith actions quickly led to the arbitrary terminations of Plaintiffs.

131.    In June 2014, Covis informed Mr. Goeken, Mr. Elstad, and Ms. Brown that their positions were being eliminated. Around the time, however, Ms. Brown learned that Covis had been recruiting individuals for her role. Similarly, Mr. Goeken was told

that his position would be moved to a new location in Philadelphia, Pennsylvania, when, in fact, his replacement worked in the North Carolina offices.

132.     Ms. Brown, Mr. Elstad, and Mr. Goeken were all terminated in violation of anti-discrimination laws. Plaintiffs Elstad and Goeken were both approaching retirement, while Ms. Brown is African American. Each was in a protected class, and Covis replaced each of them with an individual who was not in a protected class. But Plaintiffs elected not to pursue their meritorious claims because they continued to believe that Covis and Cerberus were good faith actors who, at a minimum, would comply with their prior promises. As they eventually learned, their trust was misplaced.

133.     Ms. Brown was involuntarily terminated without cause on June 24, 2014, with 35% of her time-based Profits Interests, *i.e.,* 17.5% of her total Profits Interests, vested.

134.     Mr. Elstad was involuntarily terminated without cause on June 30, 2014, with 35% of his time-based Profits Interests, *i.e.*, 17.5% of his total Profits Interests, vested.

135.     Mr. Goeken was treated slightly differently. Covis involuntarily terminated without cause Mr. Goeken, but offered him a diminished, part-time position.

136.     Over the summer of 2014, while Mr. Goeken debated whether to remain with CPI in his part-time position, Covis withheld from him that a number of pharmaceutical companies had recently issued bids to buy Covis's assets, and that a Winding Up Event was imminent.

137.    Thus, when Mr. Goeken declined Covis's offer to remain as a part-time, employee, he only did so because Covis had failed to provide him with information that Covis knew was material to his decision.

138.    Mr. Goeken voluntarily left Covis under its false pretenses on August 14, 2014, with 35% of his time-based Profits Interests, *i.e.*, 17.5% of his total Profits Interests, vested.

139.    Immediately following Mr. Goeken's termination, Covis received additional bids to purchase its assets, though the terms of those bids were never disclosed to Plaintiffs.

140.    Meanwhile, Defendant Kelly informed Ms. Homan that, due to internal reorganizations, she was being moved from her post in Acute Care, Group Purchasing Organizations ("GPO") to Integrated Delivery Networks ("IDN") and focus on cardiology business. Despite the shift, Ms. Homan retained the majority of her GPO duties.

141.    A few months later, in November 10, 2014, Covis announced that it would be terminating its cardiovascular sales team, including Ms. Homan and Mr. Sampere. Covis justified the terminations by saying that it was eliminating its cardiovascular line of products.

142.    Contrary to its representations, however, Covis did not eliminate its cardiovascular line of products, which was one of its most profitable lines, and a prime target for acquisition.

143.    Covis further justified terminated Ms. Homan on the grounds that IDN had been eliminated. Because her role was primarily GPO-related, the bad faith of her termination was readily apparent.

144.    Ms. Homan was involuntarily terminated without cause on December 1, 2014, with 65% of her time-based Profits Interests, *i.e.*, 32.5% of her total Profits Interests, vested.

145.    Mr. Sampere was involuntarily terminated without cause effective December 15, 2014, with 65% of his time-based Profits Interests, *i.e.*, 32.5% of his total Profits Interests, vested.

146.    All of Plaintiffs' terminations were arbitrary and in bad faith, a fact that Covis attempted to obscure by offering materially misleading justifications. Furthermore, the terminations occurred at precisely the time Covis and Cerberus had always anticipated selling the Covis Enterprise, an event that would have caused all of Plaintiffs' time-based Profits Interests to immediately vest. Unsurprisingly, the Concordia Acquisition was on the horizon.

## IX.    COVIS AND CERBERUS ACT IN BAD FAITH, SIMULTANEOUSLY REVEALING THEIR EFFORTS TO DEFRAUD PLAINTIFFS

147.    Covis received numerous acquisition bids over the course of 2014. Upon information and belief, Covis received a bid of approximately $800 million in mid-December. Because Covis owed less than a total of $300 million in debt and class A preferred equity, Covis would have realized more than $500 million in profits had it accepted the $800 million bid. Nevertheless, Covis decided not to pursue the offer.

148.    Given the recent flurry of bids, Covis issued repurchase agreements to Plaintiffs on December 31, 2014 (the "Repurchase Agreements") in anticipation of its

imminent acquisition. The Repurchase Agreements – which are riddled with typos evidencing their rushed drafting – indicated that Covis had decided to exercise its call option and repurchase Plaintiffs' MIP US Profits Interests per the terms of the 2013 Award Agreements.

149.    Though nominally "agreements," the Repurchase Agreements entailed no new obligations for Covis, offered no new consideration by Covis, and merely notified Plaintiffs that Covis was exercising its call option under the 2013 Award Agreement. Nevertheless, the Repurchase Agreements sought broad, one-sided, and unenforceable releases from Plaintiffs' to dissuade them from exercising their legal rights under the Award Agreements.

150.    The Repurchase Agreement indicated that it was between Plaintiffs, on the one hand, and Covis US Holdings, MIP US, and CPI, on the other.

151.    Pursuant to the Repurchase Agreements, Covis stated that it would pay Plaintiffs the following: $17,298 to Ms. Brown for the 17.5% of her 72,289 MIP US Profits Interests that had vested; $43,224 to Mr. Elstad for the 17.5% of his 195,724 MIP US Profits Interests that had vested; $69,190 to Mr. Goeken for the 17.5% of his 313,158 MIP US Profits Interests that had vested; and $80,310 each to Ms. Homan and Mr. Sampere for the 32.5% of their 195,724 MIP US Profits Interests that had vested.

152.    The Repurchase payments were shockingly low. As detailed below, the Repurchase Agreements materially misrepresented the value of Plaintiffs MIP US Profits Interests.

153.    The Repurchase Agreements mysteriously did not include any valuation information. There were no documents representing the fair market value of Covis at the

time of Plaintiffs' terminations, nor were there any documents indicating that Covis had used the agreed-upon formula to calculate the repurchase price.

154.    Plaintiffs demanded an explanation. In January 2015, both Ms. Homan and Mr. Goeken spoke with Defendant Kelly. He told them that the Repurchase payment was premised on a valuation that Cerberus had conducted at least six months earlier, which had concluded that Covis was worth approximately $470 million, with $160 million in profits. He further stated that Covis and Cerberus had concluded that no significant corporate event had occurred since that valuation had been conducted to affect the value of Covis; the value had remained perfectly steady. Thus, Covis and Cerberus had used the same $470 million valuation to determine the fair market value of Plaintiffs' MIP US Profits Interests as of each of their termination dates in June, August, and December 2014.

155.    Defendant Kelly's representations revealed the fraud and bad faith acts committed by Covis and Cerberus.

156.    Most obviously, Covis and Cerberus did not apply the agreed-upon formula to calculate the value of Plaintiffs' Profits Interests as represented by Mr. Collins, nor did they apply the promised 31% tax gross-up.

157.    Furthermore, Covis was contractually obligated to calculate the fair market value of Plaintiffs' MIP US Profits Interests in "good faith," taking into consideration "all relevant factors." Yet, the valuation ignored the bids that Covis had received over the course of 2014, which indicated that Covis was worth at least $800 million, rather than $470 million.

158.    Plaintiffs demanded valuation materials from Covis and Cerberus to support Defendant Kelly's representations. No documentation was provided.

159.    In response to continued inquiries from Plaintiffs, Covis issued notice letters to Plaintiffs on February 19, 2015, which attached a new valuation of their vested Profits Interests as of their termination dates (the "February 19 Valuation").

160.    The February 19 Valuation used a completely different methodology that was Defendant Kelly's representations from just six weeks earlier, as well as Defendant Klemperer's representations during the Presentation, the CPI Equity Schedules, and Mr. Collins's representations.

161.    The February 19 Valuation was purportedly based upon the Supply Agreement that Defendant Klemperer had referenced in the Presentation. But Plaintiffs had never received copies of the Supply Agreement. Moreover, the terms of the Supply Agreement as-executed, which were referenced in the February 19 Valuation, were nothing like what Defendant Klemperer had promised they would be.

162.    For example, during the Presentation, Defendant Klemperer had expressly represented that the Supply Agreement would guarantee CPI 7% of the equity and income of the Covis Enterprise, which would be distributed to Plaintiffs in exchange for their MIP US Profits Interests. Instead, the Supply Agreement as-executed only gave CPI just a portion of the profits on *product sales* over a nine-month period. As a result, the assets of CPI were a tiny fraction of what Covis and Cerberus had promised they would be.

163.    Defendant Klemperer had also expressly represented during the Presentation that the 90/10 profits allocation between Covis Pharma and CPI was for tax

purposes only, and that it would have no negative effect on the value of Plaintiffs' MIP US Profits Interests. Yet, in the February 19 Valuation, Covis and Cerberus reduced the value of Plaintiffs' MIP US Profits Interests by 90%, referencing the 90/10 profits allocation. Finally, once again, there was no 31% tax gross-up.

164.    In short, Covis used non-arm's length agreements between affiliated Covis entities, which were controlled by Cerberus, to justify paying Plaintiffs a small fraction of what Covis and Cerberus had promised them. These agreements were never disclosed to Plaintiffs and their material terms were repeatedly misrepresented.

165.    All too conveniently, the February 19 Valuation method – with its bad faith manipulations – was roughly consistent with the Repurchase payment in the Repurchase Agreements. Covis manipulated the results under both valuation methods to mislead Plaintiffs into thinking that they were accurate.

166.    Despite Plaintiffs' continued protests, Covis's February 19 letter stated that the terms of the Repurchase were final and non-negotiable, and that the Repurchase would close "whether or not you execute your repurchase agreements." The February 19 letter thus acknowledged that the Repurchase Agreement was no agreement at all. Furthermore, the Repurchase was premised upon Covis's materially misrepresentation that the MIP US Board of Managers had determined the value of Plaintiffs' MIP US Profits Interests in good faith.

167.    The 2013 Award Agreements allowed the closing to occur within fifteen business days from the issuance of the call notice, but Covis set the closing just five business days after issuance of the notice letters.

168.    Covis canceled Plaintiffs' MIP US Profits Interests on February 26, 2015. The reason for Covis's rush to close the Repurchases was soon revealed.

**X.    COVIS SELLS SUBSTANTIALLY ALL OF ITS ASSETS FOR $1.2 BILLION**

169.    On March 9, 2015, just eleven days after the forced, nonconsensual closing of the Repurchase, Covis announced that it had sold 85% of its pharmaceuticals portfolio to Concordia for $1.2 *billion*. The Concordia Acquisition involved substantially all of Covis's assets – eighteen of its twenty-one products – with Concordia stating in public announcements that it had specifically targeted Covis's cardiovascular products, the very line of products that Covis had said it was eliminating when it terminated Mr. Sampere and Ms. Homan.

170.    Without Plaintiffs' knowledge, Covis and Concordia began negotiating the Concordia Acquisition in January 2015, more than a month prior to the closing of the Repurchase. In fact, the accelerated closing for the Repurchase was solely to tie up loose ends and facilitate the Concordia Acquisition.

171.    When Covis exercised its call option and canceled Plaintiffs' MIP US Profits Interests while stating that Covis was worth a mere $470 million, Covis and Cerberus knew that Concordia was about to acquire substantially all of Covis's assets for $1.2 billion, and that the total value of the Covis Enterprise was well in excess of that figure.

172.    The Concordia Acquisition underscored the deceit and bad faith committed by Covis and Cerberus. When valuing the Covis Enterprise, they not only ignored unsolicited bids that are obviously relevant indications of fair market value, but also an imminent sale, which is the best indicator of fair market value. Instead, Covis

used an internally-created, discredited valuation that Covis and Cerberus knew undervalued the Covis Enterprise by more than $800 million.

173.    With its bad faith and fraud now revealed, Covis and Cerberus inexplicably stood by their $470 million valuation in the wake of the Concordia Acquisition and refused to revisit the forced Repurchases.

174.    For example, on April 1, 2015, Defendant Benjamin, a Cerberus employee who sat on the MIP US Board of Managers, represented to Ms. Homan that Covis was worth $470 million as of December 1, 2014, the same value Cerberus ascribed to Covis as of Ms. Brown's and Mr. Elstad's terminations June 2014. Defendant Benjamin could not explain why Covis's value would have remained perfectly steady between June and November 2014, then increased by approximately 300% between December 1, 2014 and March 9, 2015.

175.    Upon information and belief, Covis carried approximately $300 million in debt and class A preferred equity at the time of the Acquisition. Meanwhile, the Concordia purchased 85% of Covis's assets for $1.2 billion. When the remaining assets and sale profits are included, Cerberus had realized at least $1 billion in profits over three years.

176.    If Covis and Cerberus had properly calculated the value of Plaintiffs MIP US Profits Interests – applying the formula represented by the CPI Equity Schedules and Mr. Collins's representations to the $1 billion in profits – Plaintiffs should have received no less than the following for their vested MIP US Profits Interests: $530,000 to Ms. Brown, $1,300,000 to Mr. Elstad, $2,100,000 Mr. Goeken, $2,400,000 to Ms. Homan, and $2,400,000 to Mr. Sampere. Plaintiffs should have received millions more for their

vested MIP LLC Profits Interests. And, if Covis had not terminated Plaintiffs in bad faith, the amount of Plaintiffs' vested Profits Interests would have more than doubled.

177.     All told, Plaintiffs should have received more than $30 million.

178.     Instead, Plaintiffs received a total of $290,000.

### FIRST CAUSE OF ACTION
**For Violations of § 10(b) of the Act and Rule 10b-5
(Against CPI, Covis Holdings, MIP LLC,
Covis US Holdings, MIP US, and Cerberus)**

179.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 178, above, as though fully set forth herein.

180.     CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus made many material misrepresentations and omissions in connection with Plaintiffs' acquisition and disposal of their Profits Interests.

181.     The MIP LLC and MIP US Profits Interest are securities within the meaning of the Act.

182.     When inducing Plaintiffs to enter into their 2013 Award Agreements and to continue their employment, CPI, Covis US Holdings, MIP US, and Cerberus misrepresented the terms of the Supply Agreement, misrepresented the formulas that they would use to value Plaintiffs' Profits Interests, and misrepresented that Plaintiffs would receive a tax gross-up on their MIP US Profits Interests.

183.     Similarly, by virtue of the CPI Equity Schedules, CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus misrepresented that they would calculate the fair market value of Plaintiffs' Profits Interests in relation to the CPI Management Interests, which equaled 3.5% of the Covis Enterprise profits.

184.    Because these misrepresentations related directly to the value of Plaintiffs' MIP US Profits Interests, the misrepresentations were material to Plaintiffs' decision to enter into the 2013 Award Agreement.

185.    Then, CPI, Covis US Holdings, MIP US, and Cerberus omitted to tell Plaintiffs that the Supply Agreement as-executed was nothing like the Supply Agreement as-represented and that the Supply Agreement as-executed made no reference to: (a) CPI Management Interests; (b) the allocation of 3.5% of the total profits for CPI Management; or (c) a tax gross-up.

186.    Finally, when they exercised Covis's call option and repurchased Plaintiffs' MIP US Profits Interests, CPI, Covis US Holdings, MIP US, and Cerberus knowingly misrepresented that the Covis Enterprise was worth only $470 million in order to justify paying Plaintiffs a small fraction of what they bargained for.

187.    These material misrepresentations and omissions were in connection with both the sale of Plaintiffs' Profits Interests pursuant to the execution of the Award Agreements and the forced purchase of Plaintiffs' Profits Interests pursuant to the Repurchase Agreements.

188.    CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus knew, or recklessly failed to know, that their material misrepresentations and omissions were misleading and false, with the intention and purpose of inducing Plaintiffs to continue working for CPI and then reaping the benefits of Plaintiffs' labor without paying the promised and agreed upon equity compensation.

189.    Plaintiffs reasonably relied upon the material misrepresentations and omissions by CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus.

190.    The misrepresentations and omissions by CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus caused Plaintiffs' loss as they remained in employment positions that paid them salaries below market rates and received a small fraction of what they bargained for.

191.    As a direct and proximate cause of the violation of the Act by CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus, Plaintiffs have been damaged in an amount to be proven at trial.

### SECOND CAUSE OF ACTION
**For Control Person Liability under § 20(a) of the Act**
**for Violations of § 10(b) of the Act and Rule 10b-5**
**(Against Cerberus)**

192.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 191, above, as though fully set forth herein.

193.    Cerberus is, or was, directly or indirectly, a control person of MIP LLC and MIP US for purposes of Section 20(a) of the Act.

194.    As a control person of MIP LLC and MIP US, Cerberus is jointly and severally liable with and to the same extent as the controlled MIP LLC and MIP US for their violations of Section 10(b) of the Act and Rule 10b-5 promulgated thereunder.

### THIRD CAUSE OF ACTION
### For Violations of the North Carolina Securities Act, N.C.G.S. § 78A-56
### (Against CPI, Covis Holdings, MIP LLC,
### Covis US Holdings, MIP US, and Cerberus)

195.   Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 194, above, as though fully set forth herein.

196.   CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus made many material misrepresentations in connection with Plaintiffs' acquisition and disposal of their Profits Interests.

197.   The MIP LLC and MIP US Profits Interest are securities within the meaning of the North Carolina Securities Act.

198.   When inducing Plaintiffs to enter into their 2013 Award Agreements and to continue their employment, CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus misrepresented the terms of the Supply Agreement, misrepresented the methods that they would use to value Plaintiffs' Profits Interests, and misrepresented that Plaintiffs would receive a tax gross-up on their MIP US Profits Interests.

199.   Similarly, by virtue of the CPI Equity Schedules, CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus misrepresented that they would calculate the fair market value of Plaintiffs' Profits Interests in relation to the CPI Management Interests.

200.   Because these misrepresentations related directly to the value of Plaintiffs' Profits Interests, the misrepresentations were material to Plaintiffs' decision to enter into the 2013 Award Agreement and continue working for Covis.

201.   Then, CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus omitted to tell Plaintiffs that the Supply Agreement as-executed was nothing

like the Supply Agreement as-represented and that the Supply Agreement as-executed made no reference to: (a) CPI Management Interests; (b) the allocation of 3.5% of the total profits for CPI Management; or (c) a tax gross-up.

202.     Finally, when they exercised Covis's call option and repurchased Plaintiffs' MIP US Profits Interests, CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus knowingly misrepresented that the Covis Enterprise was worth only $470 million in order to justify paying Plaintiffs a small fraction of what they bargained for.

203.     These material misrepresentations and omissions were in connection with both the sale of Plaintiffs' Profits Interests pursuant to the execution of the Award Agreements and the forced purchase of Plaintiffs' Profits Interests pursuant to the Repurchase Agreements.

204.     CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus knew, or recklessly failed to know, that their material misrepresentations and omissions were misleading and false, with the intention and purpose of inducing Plaintiffs to continue working for CPI and then reaping the benefits of Plaintiffs' labor without paying the promised and agreed upon equity compensation.

205.     Plaintiffs reasonably relied upon the material misrepresentations and omissions by CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus.

206.     The material misrepresentations and omissions by CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus caused Plaintiffs' loss as they remained in employment positions that paid them salaries below market rates and received a small fraction of what they bargained for.

207.    As a direct and proximate cause of the violation of the Act by CPI, Covis

Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus, Plaintiffs have been

damaged in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION
**For Control Person Liability under the North Carolina Securities Act,**
**N.C.G.S. § 78A-56(c)(1)**
**(Against Cerberus)**

208.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1

through 207, above, as though fully set forth herein.

209.    Cerberus is, or was, directly or indirectly, a control person of MIP LLC

and MIP US for purposes of § 78A-56(c)(1) of the North Carolina Securities Act.

210.    As a control person of MIP LLC and MIP US, Cerberus is jointly and

severally liable with and to the same extent as the controlled MIP LLC and MIP US

entities for their violations of § 78A-56 of the North Carolina Securities Act.

### FIFTH CAUSE OF ACTION
**For Materially Aiding under the North Carolina Securities Act,**
**N.C.G.S. § 78A-56(c)(2)**
**(Against Alexander Benjamin, Michael Kelly, and Ethan Klemperer)**

211.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1

through 210, above, as though fully set forth herein.

212.    CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and

Cerberus knowingly, or recklessly, made false representations about the content of the

Supply Agreement, how Covis would determine the fair market value of Plaintiffs'

Profits Interests, and the value of the Covis Enterprise.

213.   CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus also knowingly, or recklessly, omitted critical information about the actual content of the Supply Agreement once it was executed.

214.   Finally, when they exercised Covis's call option and repurchased Plaintiffs' MIP US Profits Interests, CPI, Covis US Holdings, MIP US, and Cerberus knowingly misrepresented that the Covis Enterprise was worth only $470 million in order to justify paying Plaintiffs a small fraction of what they bargained for.

215.   Defendants Benjamin and Klemperer are employees of Cerberus and Managing Members of MIP US.

216.   Defendant Kelly is the CEO of CPI.

217.   Defendants Benjamin, Kelly, and Klemperer knew of the fraudulent misrepresentations being made by CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus regarding the 2013 Award Agreement and the Repurchase Agreements.

218.   Defendants Kelly and Benjamin materially aided the fraudulent transactions committed by CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus by making false and/or bad faith statements in the course of justifying the valuation used to calculate the value of Plaintiffs' Profits Interests.

219.   Defendant Klemperer materially aided the fraudulent transactions committed by CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus by making false statements in the course of the Presentation.

220.   As the direct and proximate cause of the actions of Defendants Benjamin, Kelly, and Klemperer as alleged above, Plaintiffs have been damaged in amount to be proven at trial.

### SIXTH CAUSE OF ACTION
**For Violations of the New Jersey Uniform Securities Law, N.J. Stat. § 49:3-71**
**(Against CPI, Covis Holdings, MIP LLC,**
**Covis US Holdings, MIP US, and Cerberus)**

221.   Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 220, above, as though fully set forth herein.

222.   CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus made many material misrepresentations in connection with Plaintiffs' acquisition and disposal of their Profits Interests.

223.   The MIP LLC and MIP US Profits Interest are securities within the meaning of the New Jersey Uniform Securities Law.

224.   When inducing Plaintiffs to enter into their 2013 Award Agreements and to continue their employment, CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus misrepresented the terms of the Supply Agreement, misrepresented the methods that they would use to value Plaintiffs' Profits Interests, and misrepresented that Plaintiffs would receive a tax gross-up on their MIP US Profits Interests.

225.   Similarly, by virtue of the CPI Equity Schedules, CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus misrepresented that they would calculate the fair market value of Plaintiffs' Profits Interests in relation to the CPI Management Interests.

226.     Because these misrepresentations related directly to the value of Plaintiffs' Profits Interests, the misrepresentations were material to Plaintiffs' decision to enter into the 2013 Award Agreement and continue working for Covis.

227.     Then, CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus omitted to tell Plaintiffs that Supply Agreement as-executed was nothing like the Supply Agreement as-represented and that the Supply Agreement as-executed made no reference to: (a) CPI Management Interests; (b) the allocation of 3.5% of the total profits for CPI Management; or (c) a tax gross-up.

228.     Finally, when they exercised Covis's call option and repurchased Plaintiffs' MIP US Profits Interests, CPI, Covis US Holdings, MIP US, and Cerberus knowingly misrepresented that the Covis Enterprise was worth only $470 million in order to justify paying Plaintiffs a small fraction of what they bargained for.

229.     These material misrepresentations and omissions were in connection with both the sale of Plaintiffs' Profits Interests pursuant to the execution of the Award Agreements and the forced purchase of Plaintiffs' Profits Interests pursuant to the Repurchase Agreements.

230.     CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus knew, or recklessly failed to know, that their material misrepresentations and omissions were misleading and false, with the intention and purpose of inducing Plaintiffs to continue working for CPI and then reaping the benefits of Plaintiffs' labor without paying the promised and agreed upon equity compensation.

231.     Plaintiffs reasonably relied upon the material misrepresentations and omissions by CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus.

232.     The material misrepresentations and omissions by CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus caused Plaintiffs' loss as they remained in employment positions that paid them salaries below market rates and received a small fraction of what they bargained for.

233.     As a direct and proximate cause of the violation of the Act by CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus, Plaintiffs have been damaged in an amount to be proven at trial.

### SEVENTH CAUSE OF ACTION
**For Control Person Liability under the New Jersey Uniform Securities Law,
N.J. Stat. § 49:3-71(d)
(Against CPI, Covis US Holdings, and Cerberus)**

234.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 233, above, as though fully set forth herein.

235.     Cerberus is, or was, directly or indirectly, a control person of MIP LLC and MIP US for purposes of § 78A-56(c)(1) of the New Jersey Uniform Securities Law.

236.     As a control person of MIP LLC and MIP US, Cerberus is jointly and severally liable with and to the same extent as the controlled MIP LLC and MIP US entities for their violations of § 78A-56 of the New Jersey Uniform Securities Law.

*EIGHTH CAUSE OF ACTION*

**For Materially Aiding under the New Jersey Uniform Securities Law,
N.J. Stat. § 49:3-71(d)
(Against Alexander Benjamin, Michael Kelly, and Ethan Klemperer)**

237.   Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 236, above, as though fully set forth herein.

238.   CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus knowingly, or recklessly, made false representations about the content of the Supply Agreement, how Covis would determine the fair market value of Plaintiffs' Profits Interests, and the value of the Covis Enterprise.

239.   CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus also knowingly, or recklessly, omitted critical information about the actual content of the Supply Agreement once it was executed.

240.   Finally, when they exercised Covis's call option and repurchased Plaintiffs' MIP US Profits Interests, CPI, Covis US Holdings, MIP US, and Cerberus knowingly misrepresented that the Covis Enterprise was worth only $470 million in order to justify paying Plaintiffs a small fraction of what they bargained for.

241.   Defendants Benjamin and Klemperer are employees of Cerberus and Managing Members of MIP US.

242.   Defendant Kelly is the CEO of CPI.

243.   Defendants Benjamin, Kelly, and Klemperer knew of the fraudulent misrepresentations being made by CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus regarding the 2013 Award Agreement and the Repurchase Agreements.

244.    Defendants Kelly and Benjamin materially aided the fraudulent transactions committed by CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus by making false and/or bad faith statements in the course of justifying the valuation used to calculate the value of Plaintiffs' Profits Interests.

245.    Defendant Klemperer materially aided the fraudulent transactions committed by CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus by making false statements in the course of the Presentation.

246.    As the direct and proximate cause of the actions of Defendants Benjamin, Kelly, and Klemperer as alleged above, Plaintiffs have been damaged in amount to be proven at trial.

### NINTH CAUSE OF ACTION
**For Violations of the Minnesota Uniform Securities Act, Minn. Stat. § 80A.76**
**(Against CPI, Covis Holdings, MIP LLC,**
**Covis US Holdings, MIP US, and Cerberus)**

247.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 246, above, as though fully set forth herein.

248.    CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus made many material misrepresentations and omissions in connection with Plaintiffs' acquisition and disposal of their Profits Interests.

249.    The MIP LLC and MIP US Profits Interest are securities within the meaning of the Minnesota Uniform Securities Act.

250.    When inducing Plaintiffs to enter into their 2013 Award Agreements, CPI, Covis US Holdings, MIP US, and Cerberus misrepresented the terms of the Supply Agreement, misrepresented the methods that they would use to value Plaintiffs' Profits

Interests, and misrepresented that Plaintiffs would receive a tax gross-up on their MIP US Profits Interests.

251.    Similarly, by virtue of the CPI Equity Schedules, CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus misrepresented that they would calculate the fair market value of Plaintiffs' Profits Interests in relation to the CPI Management Interests.

252.    Because these misrepresentations related directly to the value of Plaintiffs' Profits Interests, the misrepresentations were material to Plaintiffs' decision to enter into the 2013 Award Agreement and continue working for Covis.

253.    Then, CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus omitted to tell Plaintiffs that the Supply Agreement as-executed was nothing like the Supply Agreement as-represented and that the Supply Agreement as-executed made no reference to: (a) CPI Management Interests; (b) the allocation of 3.5% of the total profits for CPI Management; or (c) a tax gross-up.

254.    Finally, when they exercised Covis's call option and repurchased Plaintiffs' MIP US Profits Interests, CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus knowingly misrepresented that the Covis Enterprise was worth only $470 million in order to justify paying Plaintiffs a small fraction of what they bargained for.

255.    These material misrepresentations and omissions were in connection with both the sale of Plaintiffs' Profits Interests pursuant to the execution of the Award Agreements and the forced purchase of Plaintiffs' Profits Interests pursuant to the Repurchase Agreements.

256.   CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus knew, or recklessly failed to know, that their material misrepresentations and omissions were misleading and false, with the intention and purpose of inducing Plaintiffs to continue working for CPI and then reaping the benefits of Plaintiffs' labor without paying the promised and agreed upon equity compensation.

257.   Plaintiffs reasonably relied upon the material misrepresentations and omissions by CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus.

258.   The material misrepresentations and omissions by CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus caused Plaintiffs' loss as they remained in employment positions that paid them salaries below market rates and received a small fraction of what they bargained for.

259.   As a direct and proximate cause of the violation of the Minnesota Uniform Securities Act by CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus, Plaintiffs have been damaged in an amount to be proven at trial.

### TENTH CAUSE OF ACTION
**For Control Person Liability under the Minnesota Uniform Securities Act, Minn. Stat. § 80A.76**
**(Against CPI, Covis US Holdings, and Cerberus)**

260.   Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 259, above, as though fully set forth herein.

261.   Cerberus is, or was, directly or indirectly, a control person of MIP LLC and MIP US for purposes of § 78A-56(c)(1) of the Minnesota Uniform Securities Act.

262.     As a control person of MIP LLC and MIP US, Cerberus is jointly and severally liable with and to the same extent as the controlled MIP LLC and MIP US entities for their violations of § 80A.76 of the Minnesota Uniform Securities Act.

ELEVENTH CAUSE OF ACTION
**For Individual Violations of the Minnesota Uniform Securities Act,
Minn. Stat. § 80A.76(g)(2)&(3)
(Against Alexander Benjamin, Michael Kelly, and Ethan Klemperer)**

263.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 262, above, as though fully set forth herein.

264.     CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus knowingly, or recklessly, made false representations about the content of the Supply Agreement, how Covis would determine the fair market value of Plaintiffs' Profits Interests, and the value of the Covis Enterprise.

265.     CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus also knowingly, or recklessly, omitted critical information about the actual content of the Supply Agreement once it was executed.

266.     Finally, when they exercised Covis's call option and repurchased Plaintiffs' MIP US Profits Interests, CPI, Covis US Holdings, MIP US, and Cerberus knowingly misrepresented that the Covis Enterprise was worth only $470 million in order to justify paying Plaintiffs a small fraction of what they bargained for.

267.     Defendants Benjamin and Klemperer are employees of Cerberus and Managing Members of MIP US.

268.     Defendant Kelly is the CEO of CPI.

269.     Defendants Benjamin, Kelly, and Klemperer knew of the fraudulent misrepresentations being made by CPI, Covis Holdings, MIP LLC, Covis US Holdings,

MIP US, and Cerberus regarding the 2013 Award Agreement and the Repurchase Agreements.

270.     Defendants Kelly and Benjamin materially aided the fraudulent transactions committed by CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus by making false and/or bad faith statements in the course of justifying the valuation used to calculate the value of Plaintiffs' Profits Interests.

271.     Defendant Klemperer materially aided the fraudulent transactions committed by CPI, Covis US Holdings, MIP US and Cerberus by making false statements in the course of the Presentation.

272.     As the direct and proximate cause of the actions of Defendants Benjamin, Kelly, and Klemperer as alleged above, Plaintiffs have been damaged in amount to be proven at trial.

### TWELFTH CAUSE OF ACTION
### For Breach of 2012 Award Agreement
### (Against MIP LLC)

273.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 272, above, as though fully set forth herein.

274.     Plaintiffs and MIP LLC entered into the 2012 Award Agreements in or around September 30, 2012.

275.     Plaintiffs performed their obligations under the 2012 Award Agreement.

276.     Pursuant to the 2012 Award Agreement, upon consummation of a Winding Up Event, MIP LLC owed Plaintiffs the fair market value of their vested MIP LLC Profits Interests.

277.    A Winding Up Event occurs upon the sale or acquisition of substantially all Covis's assets.

278.    Concordia acquired substantially all of Covis's assets on March 9, 2015.

279.    In breach of the 2012 Award Agreements, MIP LLC has never paid Plaintiffs anything for their MIP LLC Profits Interests.

280.    As a direct and proximate cause of the breach of the 2012 Award Agreements by MIP LLC, Plaintiffs have been damaged in an amount to be proven at trial.

281.    MIP LLC acted with reckless, willful, or callous disregard for Plaintiffs' rights and with malice, fraud or oppression toward Plaintiffs, thereby entitling Plaintiffs to an award of punitive damages in accordance with proof at trial.

### THIRTEENTH CAUSE OF ACTION
### For Breach of 2013 Award Agreement
### (Against CPI, Covis US Holdings and MIP US)

282.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 281, above, as though fully set forth herein.

283.    MIP US and Plaintiffs entered into the 2013 Award Agreements in October and November 2013.

284.    Plaintiffs performed their obligations under the 2013 Award Agreements.

285.    On December 31, 2014, Plaintiffs received the Repurchase Agreements, on behalf of CPI, Covis US Holdings, and MIP US.

286.    Per the terms of the 2013 Award Agreements, MIP US was required to pay Plaintiffs the fair market value of their vested MIP US Profits Interests as of

Plaintiffs' termination dates, as determined in "good faith," taking into account "all relevant factors."

287.    In breach of the 2013 Award Agreements, MIP US did not take into account all relevant factors in good faith.

288.    MIP US knowingly used a discredited valuation that valued the Covis Enterprise at $470 million on the grounds that no significant corporate events occurred between the time of the valuation and Plaintiffs' termination that had affected the value of the Covis Enterprise.

289.    Since the valuation had been conducted, and prior to issuance of the Repurchase Agreements, Covis had received numerous bids that far exceeded $470 million, including a bid of $800 million in December 2014.

290.    Furthermore, prior to closing the Repurchase and canceling Plaintiffs' MIP US Profits Interests – which was a forced closing that occurred over Plaintiffs' protests – Covis was negotiating the sale of substantially all of its assets to Concordia. The Concordia Acquisition ultimately closed for $1.2 billion.

291.    In bad faith, CPI, Covis US Holdings, and MIP US insisted that the Covis Enterprise was worth only $470 million, closed the Repurchase, and canceled Plaintiffs' MIP US Profits Interests, all while knowing that the valuation undervalued the Covis Enterprise by more than $800 million.

292.    As a direct and proximate cause of the breach of the 2013 Award Agreement by MIP US, CPI, and Covis US Holdings, Plaintiffs have been damaged in an amount to be proven at trial.

293.    CPI, Covis US Holdings, and MIP US acted with reckless, willful, or callous disregard for Plaintiffs' rights and with malice, fraud or oppression toward Plaintiffs, thereby entitling Plaintiffs to an award of punitive damages in accordance with proof at trial.

### FOURTEENTH CAUSE OF ACTION
**For Fraudulent Inducement and Promissory Fraud
(Against CPI, Covis Holdings, MIP LLC,
Covis US Holdings, MIP US, and Cerberus)**

294.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 293, above, as though fully set forth herein.

295.    CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus made many fraudulent misrepresentations and omissions to induce Plaintiffs to enter into the 2013 Award Agreement and continue their employment with Covis at salaries that were substantially below the market rate.

296.    During the Presentation, Defendant Klemperer, speaking on behalf of CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus, represented to Plaintiffs that the value of their MIP US Profits Interests would relate to the profits of the Covis enterprise and that any payment they received for their MIP US Profits Interests would entail an approximately 31% tax gross-up, as would be formalized in the Supply Agreement.

297.    After the Presentation, Covis distributed the CPI Equity Schedules to Plaintiffs, which represented that their Profits Interests equaled a percentage of the CPI Management Interests.

298.    Over the course of October 7 and 8, 2013, Mr. Collins, speaking in his role as CEO of CPI and on behalf of Covis and Cerberus, represented to Plaintiffs that the CPI

Management Interests referenced on Plaintiffs' CPI Equity Schedules related to 3.5% of Covis's total profits.

299.    Then, CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus omitted to tell Plaintiffs that the Supply Agreement as-executed was nothing like the Supply Agreement as-represented and made no reference to: (a) CPI Management Interests; (b) the allocation of 3.5% of the total profits for CPI Management; or (c) a tax gross-up.

300.    Finally, when they exercised Covis's call option and repurchased Plaintiffs' MIP US Profits Interests, CPI, Covis US Holdings, MIP US, and Cerberus knowingly misrepresented that the Covis Enterprise was worth only $470 million in order to justify paying Plaintiffs a small fraction of what they bargained for.

301.    CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus knew, or recklessly failed to know, that their material misrepresentations and omissions were misleading and false, with the intention and purpose of inducing Plaintiffs to continue working for CPI and then reaping the benefits of Plaintiffs' labor without paying the promised and agreed upon equity compensation.

302.    Because CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus refused to produce the operative agreements, Plaintiffs were unable to discover the falsity of the misrepresentations by CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus, and relied upon those misrepresentations to their detriment.

303.    The fraudulent misrepresentations and omissions by CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus caused Plaintiffs' loss as they

remained in employment positions that paid them salaries below market rates and received a small fraction of what they bargained for.

304.    As a direct and proximate cause of the fraudulent misrepresentations and omissions by CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus, Plaintiffs have been damaged in an amount to be proven at trial.

305.    CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus acted with reckless, willful, or callous disregard for Plaintiffs' rights and with malice, fraud or oppression toward Plaintiffs, thereby entitling Plaintiffs to an award of punitive damages in accordance with proof at trial.

### FIFTEENTH CAUSE OF ACTION
**For Aiding and Abetting For Fraudulent Inducement and Promissory Fraud
(Against Alexander Benjamin, Mike Kelly, and Ethan Klemperer)**

306.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 305, above, as though fully set forth herein.

307.    CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus made many fraudulent misrepresentations and omissions regarding Plaintiffs Profits Interests to induce Plaintiffs to enter into the 2013 Award Agreement and continue their employment with Covis at salaries that were substantially below the market rate.

308.    Defendants Benjamin, Kelly, and Klemperer knew of the fraudulent misrepresentations being made by CPI, Covis US Holdings, MIP US and Cerberus regarding the 2013 Award Agreement and the Repurchase Agreements.

309.    Defendants Kelly and Benjamin substantially assisted the fraud committed by CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus by

making false and/or bad faith statements in the course of justifying the valuation used to calculate the value of Plaintiffs' MIP US Profits Interests.

310.    Defendant Klemperer substantially assisted the fraud committed by CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus by making numerous false statements in the course of the Presentation.

311.    As the direct and proximate cause of the actions of Defendants Benjamin, Kelly, and Klemperer, Plaintiffs have been damaged in amount to be proven at trial.

312.    Defendants Benjamin, Kelly, and Klemperer acted with reckless, willful, or callous disregard for Plaintiffs' rights and with malice, fraud or oppression toward Plaintiffs, thereby entitling Plaintiffs to an award of punitive damages in accordance with proof at trial.

### SIXTEENTH CAUSE OF ACTION
### For Negligent Misrepresentation
### (Against CPI, Covis Holdings, MIP LLC,
### Covis US Holdings, MIP US, and Cerberus)

313.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 312, above, as though fully set forth herein.

314.    As Plaintiffs' employer, CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus maintained a special relationship of trust with Plaintiffs.

315.    CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus made many negligent misrepresentations and omissions to induce Plaintiffs to enter into the 2013 Award Agreement and continue their employment with Covis at salaries that were substantially below the market rate.

316.    During the Presentation, Defendant Klemperer, speaking on behalf of CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus, represented to

Plaintiffs that the value of their MIP US Profits Interests would relate to the profits of the Covis enterprise and that any payment they received for their MIP US Profits Interests would entail an approximately 31% tax gross-up, as would be formalized in the Supply Agreement.

317.    After the Presentation, Covis distributed the CPI Equity Schedules to Plaintiffs, which represented that their Profits Interests equaled a percentage of the CPI Management Interests.

318.    Over the course of October 7 and 8, 2013, Mr. Collins, speaking in his role as CEO of CPI and on behalf of Covis and Cerberus, represented to Plaintiffs that the CPI Management Interests referenced on Plaintiffs' CPI Equity Schedules related to 3.5% of Covis's total profits.

319.    Then, CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus negligently omitted to tell Plaintiffs that the Supply Agreement as-executed was nothing like the Supply Agreement as-represented and made no reference to: (a) CPI Management Interests; (b) the allocation of 3.5% of the total profits for CPI Management; or (c) a tax gross-up.

320.    Finally, when they exercised Covis's call option and repurchased Plaintiffs' MIP US Profits Interests, CPI, Covis US Holdings, MIP US, and Cerberus negligently misrepresented that the Covis Enterprise was worth only $470 million.

321.    Because these misrepresentations related directly to the value of Plaintiffs' MIP US Profits Interests, the misrepresentations were material to Plaintiffs' decision to enter into the 2013 Award Agreement.

322.   Plaintiffs reasonably and justifiably relied upon the misrepresentations to their detriment, remaining in a position that paid them salaries below market rates and receiving a small fraction of what they bargained for.

323.   As a direct and proximate cause of the negligent misrepresentations by CPI, Covis US Holdings, MIP US, and Cerberus, Plaintiffs have been damaged in an amount to be proven at trial.

### SEVENTEENTH CAUSE OF ACTION
### For Breach of the Covenant of Good Faith and Fair Dealing
### (Against CPI, Covis Holdings, MIP LLC,
### Covis US Holdings, MIP US, and Cerberus)

324.   Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 323, above, as though fully set forth herein.

325.   Plaintiffs accepted their positions at Covis at salaries below the market rate in exchange for the promise that they would receive a significant percentage of the increase in the value of the Covis Enterprise. Plaintiffs entered into the 2012 and 2013 Award Agreements for that express purpose.

326.   The 2012 and 2013 Award Agreements were simple and straightforward, but did not address obvious scenarios, such as whether CPI could terminate Plaintiffs when Covis was on the verge of a Winding Up Event, or otherwise withhold material information from Plaintiffs, solely to prevent Plaintiffs' time-based Profits Interests from fully vesting.

327.   The parties had starkly unequal bargaining power: Covis, which was backed by Cerberus, one of the largest private equity companies in the world, drafted the various agreements underlying the corporate structure and denied Plaintiffs access to

those documents. Plaintiffs had no opportunity to modify or negotiate the Award Agreements.

328.    Furthermore, Covis did not provide Plaintiffs with any information regarding a potential Winding Up Event, despite the fact that such information had a profound impact on Plaintiffs' Profits Interests under the Award Agreements and their decisions to continue their employment with Covis.

329.    Nevertheless, Plaintiffs performed their duties with great skill, and the value of Covis skyrocketed during their tenures.

330.    Plaintiffs' terminations had no business purpose whatsoever, were arbitrary and unreasonable, and were done solely to prevent Plaintiffs' from realizing the rewards of their shared risk with Covis and Cerberus.

331.    Similarly, though Covis offered to allow Mr. Goeken to remain at the Company in a diminished capacity, Covis did not disclose information that was critical to his decision, such as the fact that Covis had recently received a number of unsolicited bids and a Winding Up Event was imminent. Had Mr. Goeken remained with CPI for a couple more months, his quantity of vested Profits Interests would have tripled, allowing him to reap millions more.

332.    Because they were terminated in bad faith, or because Covis withheld information material to Mr. Goeken's employment decision in bad faith, Plaintiffs were damaged because their time-based interests did not fully vest.

333.    As a direct and proximate cause of the breach of the covenant of good faith and fair dealing by CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus, Plaintiffs have been damaged in an amount to be proven at trial.

334.     CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus acted with reckless, willful, or callous disregard for Plaintiffs' rights and with malice, fraud or oppression toward Plaintiffs, thereby entitling Plaintiffs to an award of punitive damages in accordance with proof at trial.

### EIGHTEENTH CAUSE OF ACTION
**For Unjust Enrichment**
**(Against CPI, Covis Holdings, MIP LLC,**
**Covis US Holdings, MIP US, and Cerberus)**

335.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 334, above, as though fully set forth herein.

336.     CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus realized approximately $1 billion in profits over the course of four years in large part because of Plaintiffs' efforts.

337.     Plaintiffs forewent market salaries in exchange for a stake in those profits, which CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus inequitably withheld, by numerous acts of deceit and bad faith.

338.     Plaintiffs' efforts directly enriched CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus to Plaintiffs' detriment.

339.     It would be inequitable to permit CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus to retain the benefits of Plaintiffs' labor.

340.     As the direct and proximate cause of the above malfeasance by CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus, they have been unjustly enriched in amount to be proven at trial, and such amount must be disgorged to Plaintiffs.

*NINETEENTH CAUSE OF ACTION*
**For Promissory Estoppel**
**(Against CPI, Covis Holdings, MIP LLC,**
**Covis US Holdings, MIP US, and Cerberus)**

341.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 340, above, as though fully set forth herein.

342.    CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus promised Plaintiffs at the Presentation, in the CPI Equity Schedules, and in subsequent conversations with Mr. Collins, the CEO of CPI, that Plaintiffs' Profits Interests equaled a portion of 3.5% of the profits of the Covis Enterprise, and that Plaintiffs would receive a tax gross-up of 31% on any payment they received for their MIP US Profits Interests.

343.    CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus made these promises knowing that Plaintiffs were relying upon them when Plaintiffs executed the 2013 Award Agreements and when they decided to continue their employment with CPI.

344.    CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus made these promises with the intention of inducing Plaintiffs to remain at CPI and continue working at below-market salaries.

345.    If the Court were not to enforce the promises made by CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus, great injustice would result because CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus would profit by approximately $1 billion as a direct result of their misrepresentations.

346.     As the direct and proximate cause of the actions of CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus, Plaintiffs have been damaged in amount to be proven at trial.

### TWENTIETH CAUSE OF ACTION
### For Equitable Estoppel
### (Against CPI, Covis Holdings, MIP LLC,
### Covis US Holdings, MIP US, and Cerberus)

347.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 346, above, as though fully set forth herein.

348.     CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus promised Plaintiffs at the Presentation, in the CPI Equity Schedules, and in subsequent conversations that Plaintiffs' Profits Interests equaled a portion of 3.5% of the profits of the Covis Enterprise, and that Plaintiffs would receive a tax gross-up of 31% on any payment they received for their MIP US Profits Interests.

349.     CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus made these promises knowing that Plaintiffs were relying upon them when Plaintiffs executed the 2013 Award Agreements and when they decided to continue their employment with CPI.

350.     Plaintiffs lacked knowledge of the assets owned by CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus and the value of the Covis Enterprise, and were unable to obtain such knowledge because CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus withheld critical corporate information and misrepresented the content of the Supply Agreement and the other operative agreements. The operative agreements and relevant information remained exclusively in

the possession of CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus, and they refused to produce copies to Plaintiffs.

351.    Plaintiffs reasonably relied upon the representations of CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus regarding the content of the Supply Agreement and other relevant corporate documents, and relied upon their representations as to how they would value Plaintiffs' Profits Interests.

352.    As a result of Plaintiffs' reliance on the false statements and omissions by CPI, Covis Holdings, MIP LLC, Covis US Holdings, MIP US, and Cerberus, Plaintiffs suffered a prejudicial change, continuing to work at Covis for a reduced salary and foregoing other entrepreneurial and professional opportunities.

353.    As the direct and proximate cause of the actions by CPI, Covis US Holdings, MIP US and Cerberus, Plaintiffs have been damaged in amount to be proven at trial.

### *DEMAND FOR JURY TRIAL*

Plaintiffs hereby demand a trial by jury as to all issues so triable.

### *PRAYER FOR RELIEF*

Wherefore, Plaintiffs demand judgment:

(a)   awarding Plaintiffs damages and/or equitable remedies in an amount to be determined at trial;

(b)   awarding Plaintiffs punitive damages in an amount to be determined at trial;

(c)   awarding Plaintiffs pre-judgment interest on any recovery;

(d)   awarding Plaintiffs their costs and disbursements, including attorney's, accountant's, and expert witness's fees ; and

(e)   granting such other and further relief as the Court deems just and proper.

Dated: November 17, 2015
      New York, New York

By:   Joshua L. Seifert
Joshua L. Seifert PLLC
40 Worth Street, 10th Floor
Telephone:   646-527-7366
Email:      jseifert@seifertpllc.com
*Attorney of Plaintiffs Tonya Brown, John*
*Elstad, Albert Goeken, Elizabeth Homan,*
*and Jeffery Sampere*

Exhibit A

## CPI Equity Schedule

**Prior Equity Allocation:**

| Class B - Old | Time Vested / Change of Control | Performance Based | Units in Covis Holdings LP (Cayman) [1] | % Interest of CPI Mgmt Interests | Total Covis Holdings Interest Post Sanofi Dilution [2] |
|---|---|---|---|---|---|
| Jeff Sampere | 12,500 | 12,500 | 25,000 | 16.4% | 0.17% |

**New Equity Allocation:**

| Class B - New | Time Vested / Change of Control | Performance Based | Units in Covis Mgmt Investors US LLC | % Interest of CPI Mgmt Interests |
|---|---|---|---|---|
| Jeff Sampere | 97,862 | 97,862 | 195,724 | 16.4% |

1) Assumes 100% Vesting of Performance and Time Interests Upon Change of Control or Winddown

2) Class A shareholders invested $40mm of new capital to consummate the Sanofi transaction on April 4, 2013 resulting in 30% dilution to Class B shareholders

**DISCLAIMER :** Neither Covis nor any of its affiliates or subsidiaries (collectively, the "Covis Parties") make any representation that the information contained herein is complete or accurate. The information may contain views and opinions of certain market conditions and is subject to change without notice. All levels, prices and spreads are historical and do not necessarily represent current market levels, prices or spreads, some or all of which may be materially different than the information contained herein. The information contained herein is being provided for illustrative purposes and is not, and should not be construed as, any commitment or other obligation on the part of the Covis Parties. Covis Parties make no representations regarding any legal, tax, accounting or other aspects of any transactions or strategies mentioned herein.